**Ralph C. FELTROP, Plaintiff–Appellant,**

v.

**Paul K. DELO, Defendant–Appellee.**

No. 93–2738.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1994.

Decided Jan. 27, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 28, 1995.*

---

* Arnold, Chief Judge and McMillian, Circuit Judge, would grant the suggestion for rehearing en banc.

Richard Sindel, Clayton, MO, argued for appellant.

Millie Aulbur, Asst. Atty. Gen., Jefferson City, MO, argued for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

LOKEN, Circuit Judge.

Ralph C. Feltrop, a Missouri inmate under sentence of death, appeals the judgment of the district court denying his petition for a writ of habeas corpus. Feltrop raises numerous issues, the most difficult being whether the Supreme Court of Missouri correctly applied *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to cure the trial court's sentencing-stage error in instructing the jury on a "depravity of mind" aggravating circumstance. We affirm.

## I. Background

On March 16, 1987, shortly after a mutilated, dismembered female torso was found in St. Charles County, Missouri, Feltrop reported to the Jefferson County Sheriff's Department that his live-in girlfriend, Barbara Ann Roam, had been missing for a week. Suspecting that the body could be Ms. Roam, a Jefferson County deputy sheriff contacted Feltrop that evening and asked him to meet with St. Charles County investigators. Feltrop drove to the Jefferson County Sheriff's office, arriving at approximately 9:00 p.m. He waited until officers of the St. Charles County Sheriff's Department arrived at about 11:30 p.m.

Two St. Charles officers began questioning Feltrop in the small watch commander's office at 11:45 p.m., asking about his relationship with Roam and her disappearance. Feltrop initially stated that he had last seen

Roam two weeks earlier leaving their home with an unknown man. At approximately 1:10 a.m., an officer asked Feltrop whether he was a Christian and would tell the truth; Feltrop responded, "She clawed me and tried to take the knife." The officers immediately warned Feltrop of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which he waived, and the questioning resumed. Feltrop then said that he had killed Roam in self-defense and later directed the officers to a partially submerged trash bag in a pond in Jefferson County which contained Roam's head, hands, and lower legs.

In June 1988, Feltrop was tried in the Circuit Court of Jefferson County and convicted of murder in the first degree. *See* Mo.Rev.Stat. § 565.020 (1986).[1] Following the guilty verdict, the court conducted a penalty stage of the trial, as prescribed in Mo. Rev.Stat. § 565.030.4. Under this statute, if the jury concludes beyond a reasonable doubt that at least one statutory aggravating circumstance exists, it then considers whether the death penalty should be imposed, taking into account all evidence in aggravation and mitigation of punishment presented during the guilt and penalty stages of the trial. If the jury returns a verdict of death, it must set out in writing the aggravating circumstance(s) it has found. *See generally State v. Shaw*, 636 S.W.2d 667, 675 (Mo. banc), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Bolder*, 635 S.W.2d 673, 683 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *Bolder v. Armontrout*, 921 F.2d 1359, 1367 (8th Cir.1990), *cert. denied*, 502 U.S. 850, 112 S.Ct. 154, 116 L.Ed.2d 119 (1991). The trial court then has the power to reduce this punishment "if it finds that the punishment is excessive." Rule 29.05 of the Missouri Rules of Criminal Procedure.

At the conclusion of the penalty-stage evidence, the trial court submitted one statutory aggravating circumstance to the jury, whether "the murder of Barbara Ann Roam involved torture and or depravity of mind and

---

1. All references will be to the Missouri statutes in effect when Feltrop was tried. Many of these statutes were amended in 1993.

that as a result thereof it was outrageously or wantonly vile, horrible or inhuman," the factor enumerated in Mo.Rev.Stat. § 565.032.2(7). The jury's verdict of death included a written finding that the murder "involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman."

The trial court denied Feltrop's Rule 29.05 motion for reduction of sentence, imposed the death sentence, and later denied Feltrop's motion for post-conviction relief after an evidentiary hearing. The Supreme Court of Missouri affirmed the conviction and sentence and the denial of post-conviction relief in a consolidated appeal. *State v. Feltrop,* 803 S.W.2d 1 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). That Court subsequently denied Feltrop's petition for state habeas corpus and motion to recall the mandate. Feltrop then petitioned the district court for a writ of habeas corpus, presenting seventeen grounds for relief. He now appeals the district court's [2] denial of that petition.

## II. Sentencing Issues

### A. *The Aggravating Circumstance Instruction*

In *State v. Preston,* 673 S.W.2d 1, 10–11 (Mo. banc), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), the Missouri Supreme Court acknowledged that applying the "depravity of mind" statutory aggravating circumstance "without proper tethers" might run afoul of the U.S. Supreme Court's decision in *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980), which held that the words "outrageously or wantonly vile, horrible and inhuman," standing alone, do not "impl[y] any inherent restraint on the arbitrary and capricious infliction of the death sentence." [3] Accordingly, the Court in *Pres-*

*ton* defined factors to be considered in determining whether depravity of mind may be found in a particular case:

> mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

673 S.W.2d at 11. In this case, the trial court nonetheless charged the bare language of this statutory aggravating circumstance, the only one it submitted to the jury. Feltrop therefore argued to the Missouri Supreme Court that his death sentence must be set aside because this instruction was unconstitutionally vague.

The Missouri Supreme Court agreed that its limiting definition of "depravity of mind" should have been given to the jury. However, relying on *Walton,* it denied Feltrop relief from his death sentence. The Court held that (i) Missouri law prescribes a "hybrid" sentencing procedure in which the sentencing judge acts as the final sentencer; (ii) the trial court in denying Feltrop's motion for reduction of sentence must be presumed to have applied the limiting depravity-of-mind factors enunciated in *Preston;* and (iii) the evidence supports the finding that the murder involved depravity of mind as construed in *Preston.* 803 S.W.2d at 14–17. [4] The district court held that this appellate review "was sufficient to cure the jury's unchanneled discretion."

On appeal, Feltrop argues that the district court erred in concluding that the Missouri Supreme Court cured the trial court's failure to give the jury an instruction that narrowed the depravity-of-mind aggravating circumstance. We note that there are two facets of

---

2. The HONORABLE DONALD J. STOHR, United States District Judge for the Eastern District of Missouri.

3. *See also Maynard v. Cartwright,* 486 U.S. 356, 362–64, 108 S.Ct. 1853, 1858–59, 100 L.Ed.2d 372 (1988) (the words "especially heinous, atrocious, or cruel," by themselves, are likewise impermissibly vague).

4. By law, the Missouri Supreme Court must determine "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Mo.Rev.Stat. § 565.035.3(2).

the Missouri Supreme Court's "cure": first, that the jury instruction error was cured by the trial judge in his role as "final sentencer," and second, that the error was also cured by the appellate court's conclusion, based on its independent review of the evidence, that the record supports the jury's depravity-of-mind finding under the proper *Preston* standard. To prevail on this issue, Feltrop must establish that *both* of these grounds are constitutionally defective.

■ 1. Feltrop argues that the Missouri Supreme Court's first curative holding—that the trial judge cured the instructional error when it denied Feltrop's motion for reduction of sentence—conflicts with the pronouncement in *Walton* that, "[w]hen a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process." 497 U.S. at 653, 110 S.Ct. at 3057. But *Walton* went on to state:

> But the logic of [*Godfrey* and *Maynard*] has no place in the context of sentencing by a trial judge. . . . If the Arizona Supreme Court has narrowed the definition of the "especially heinous, cruel or depraved" aggravating circumstance, we presume that Arizona trial judges are applying the narrower definition.

*Id.* at 653, 110 S.Ct. at 3057. The Missouri Supreme Court determined that the trial judge is the "final sentencer" when it acts upon a motion for reduction of sentence. We must accept that interpretation of state law, and the Constitution does not require that the jury impose the death sentence or make particular findings necessary to impose that sentence. *See, e.g., Clemons v. Mississippi,* 494 U.S. 738, 746, 110 S.Ct. 1441, 1447, 108 L.Ed.2d 725 (1990) ("[N]either the Sixth Amendment, nor the Eighth Amendment, nor any other constitutional provision provides a defendant with the right to have a jury determine the appropriateness of a capi-

tal sentence."); *Walton,* 497 U.S. at 647–48, 110 S.Ct. at 3053–54.

■ Feltrop further contends that the trial judge did not cure the instructional error because the *Walton* presumption—that a trial judge applies the correct limiting construction in making an aggravating circumstance finding—is inappropriate when the trial judge has failed to give the *Preston* limiting instruction in charging the jury. However, neither *Preston,* nor *Godfrey* which prompted *Preston,* discussed whether a limiting instruction must be given to the sentencing jury. Rather, those cases concerned the reviewing appellate court's function of determining whether a vague aggravating circumstance instruction had resulted in the "standardless and unchanneled imposition" of the death penalty. *Godfrey,* 446 U.S. at 429, 100 S.Ct. at 1765; *see Preston,* 673 S.W.2d at 10–11. Here, the trial judge's description of the murder and subsequent mutilation and dismembering of Barbara Roam undeniably satisfy the depravity-of-mind standard as narrowly construed in *Preston.*[5] In these circumstances, the Missouri Supreme Court did not commit constitutional error in invoking the *Walton* presumption.

■ 2. The Missouri Supreme Court separately cured the trial court's instructional error by making an independent depravity-of-mind finding under the narrow *Preston* standard. *Walton* expressly contemplated that a state appellate court may cure in this manner:

> Moreover, even if a trial judge fails to apply the narrowing construction or applies an improper construction, the Constitution does not necessarily require that a state appellate court vacate a death sentence based on that factor. Rather . . . a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined. . . .

---

5. The Missouri Supreme Court quoted from the trial judge's report of the case: "Defendant was charged with first degree murder involving the death of Barbara Ann Roam by severing the cervical chord at C5 and severing the vertebral artery with a heavy knife struck with considerable force causing the then paralyzed victim to bleed to death slowly from fifteen minutes to four hours. After allowing the victim to bleed to death through the small vertebral artery, the victim's body was dismembered and her torso was found in a trunk in St. Charles County and her head, hands, feet, arms and legs were found in a stock watering pond in Jefferson County." 803 S.W.2d at 16 n. 1.

497 U.S. at 653–54, 110 S.Ct. at 3057. Feltrop argues that the Missouri Supreme Court's finding did not cure the trial court's constitutional error because the appellate court did not also reweigh the depravity-of-mind circumstance against the mitigating evidence, and did not conduct a harmless error analysis. He contends that these additional curative measures are required by recent U.S. Supreme Court decisions such as *Richmond v. Lewis*, —— U.S. ——, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992), *Sochor v. Florida*, —— U.S. ——, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), and *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). However, those cases dealt with the role of a reviewing appellate court in so-called "weighing" States, where the jury must weigh the statutory aggravating circumstances against any mitigating circumstances in deciding whether to impose or recommend the death penalty. Missouri is not a weighing State. Under Missouri law, once the jury finds an aggravating circumstance, it is free to consider all the evidence in deciding whether to recommend the death penalty. *See LaRette v. Delo*, 44 F.3d 681, 687 n. 4 (8th Cir.1995). Under this type of capital sentencing procedure, "the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983).[6]

As *Zant* makes clear, when the appellate court in a non-weighing State concludes that the jury was given an improperly vague aggravating circumstance instruction, it must determine (i) whether the jury's findings "adequately differentiate this case in an objective, evenhanded, and substantively rational way" from other murder cases, 462 U.S. at 879, 103 S.Ct. at 2744, and (ii) whether the faulty instruction either permitted the jury to consider inadmissible evidence, or caused the jury to give inappropriate weight to particular evidence, 462 U.S. at 886–89, 103 S.Ct. at 2747–49. The Missouri Supreme Court performed that function when it reviewed the evidence and concluded that it supported the jury's depravity-of-mind finding under the *Preston* standard. *See Maynard*, 486 U.S. at 362–63, 108 S.Ct. at 1858–59; *Mathenia v. Delo*, 975 F.2d 444, 449–50 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993).[7] Moreover, the Missouri Supreme Court's discussion of the evidence, particularly that quoted in note 5 *supra*, brings this case squarely within the purview of *Battle v. Delo*, 19 F.3d 1547, 1562 (8th Cir.1994): "[e]ven if a jury does not make specific findings that the murder involved torture, a finding by the state court of evidence that the victim had a substantial period of time before death to anticipate and reflect on it is a proper limiting construction of the aggravating circumstance instruction." The district court properly rejected this claim.

## B. The Imprisonment for Life Instruction

■ The jury was instructed that, as an alternative to the death penalty, Feltrop could be sentenced to "imprisonment for life by the Division of Corrections without eligibility for probation or parole." After an hour of deliberation, the jury sent a note to the trial judge asking:

Is there any legal situation under which a person can be released who has received life without parole; that is pardoned by the governor. Please distinguish between life in prison and natural life. Are these one in the same? What is the length of life, capital life.

6. *Zant* concerned the capital sentencing system of Georgia, upon which Missouri's system is based. *See State v. Mercer*, 618 S.W.2d 1, 10 n. 5 (Mo. banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

7. Feltrop's reliance on *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990), is misplaced because in *Newlon*, which the Missouri Supreme Court decided before *Preston*, that Court "did not provide a limiting construction of the term" depravity of mind, 885 F.2d at 1335. *Rust v. Hopkins*, 984 F.2d 1486 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), is distinguishable for many reasons, most importantly, because Nebraska is a weighing State.

Feltrop's attorney requested the response, "You're not to infer anything other than the literal meaning of the instructions."[8] The trial judge told the jury, "You must be guided by the instructions that the court has given you," a response consistent with state law. *See* 803 S.W.2d at 14. Feltrop now argues that the failure to provide the jury further explanation of "life without parole" unconstitutionally limited the jury's consideration of a factor relevant in deciding whether the death penalty should be imposed. This contention is without merit.

In *Simmons v. South Carolina,* —— U.S. ——, ——, 114 S.Ct. 2187, 2196, 129 L.Ed.2d 133 (1994), the Supreme Court recently explained that *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), "stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing." *Simmons* held that, if the State urges the death penalty on the ground of a defendant's future dangerousness, the jury should be told, by argument or instruction, that life imprisonment without possibility of parole is the alternative penalty. The instruction in this case complied with *Simmons.* The trial court's response to the jury's subsequent inquiry was consistent with the response requested by Feltrop's counsel and with state law. The court's initial instruction was sufficiently clear that its refusal to further explain the phrase, imprisonment for life without eligibility for probation or parole, was not "a fundamental defect that resulted in a complete miscarriage of justice or so infected the entire trial as to deprive the defendant of a fair trial." *Baker v. Leapley,* 965 F.2d 657, 659 (8th Cir.1992) (quotation omitted).

### III. Issues in Determining Guilt

#### A. *Admission of Incriminating Statements*

Feltrop argues that his incriminating statements to police investigators were improperly admitted at trial because (1) the statements were involuntary, and (2) the first

incriminating statement was elicited before he received *Miranda* warnings.

■ (1) For his incriminating statements to be involuntary, Feltrop must show that, at the time he made them, the statements were the product of coercive police activity and his "will [was] overborne and his capacity for self-determination critically impaired." *Sumpter v. Nix,* 863 F.2d 563, 565 (8th Cir. 1988), quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). We review the question of voluntariness *de novo;* state court findings "are entitled to a presumption of correctness." *Evans v. Dowd,* 932 F.2d 739, 741 (8th Cir.), *cert. denied,* 502 U.S. 944, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991).

Feltrop argues that he was questioned late at night in a "claustrophobic" nine-foot-by-nine-foot office when he was nervous, tired, distraught, and cried periodically. He complains that certain statements by the questioning officers were inherently coercive— asking whether he was a Christian, telling him that Roam's killer had "blood on his hands" that "would never wash off," and asking where the remainder of Roam's body was so that she could be given "a proper burial." However, "there is nothing inherently wrong with efforts to create a favorable climate for confession." *Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993) (quotation omitted).

After careful review of the record in light of the state court findings, *see* 803 S.W.2d at 13, we agree with the district court that Feltrop's incriminating statements were not the product of unconstitutional coercion. The statements were not preceded by lengthy interrogation. The interview was interrupted by several breaks, during which Feltrop used the restroom and drank a soda. When he became upset, he was given time to calm down. There were no police threats or intimidation, and he was informed of his *Miranda* rights prior to confessing. "Any interview of one suspected of a crime . . . will have coercive aspects to it." *Oregon v. Mat-*

---

8. Counsel understandably did not want the jury advised of the possibility that Feltrop might be pardoned.

*hiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Feltrop has failed to prove that his will was overborne by this questioning.

■ (2) After a suppression hearing, the Missouri courts rejected Feltrop's *Miranda* claim on the ground that he was not in custody when he first made an incriminating statement. 803 S.W.2d at 13. This finding is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Krantz v. Briggs,* 983 F.2d 961, 964 (9th Cir.1993); *Purvis v. Dugger,* 932 F.2d 1413, 1418–19 (11th Cir.1991), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992). Custody for *Miranda* purposes is an objective test that turns on whether there was "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* — U.S. —, —, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (quotation omitted). *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714.

Though he initially went to the Jefferson County station voluntarily, Feltrop argues that he was in custody because he waited there a long time for the arrival of the St. Charles County interviewing officers and because, when the interview did occur, it was conducted by two officers in a very small room. The Missouri Supreme Court found that "[a]t all times prior to his making the incriminating statement, [Feltrop] was free to depart." That Court also noted:

> [E]ven after [Feltrop] confessed, he apparently assumed he was free to go; he asked to drive his own vehicle to the discovery site of the body parts so that he could later return home in time to go to work.

803 S.W.2d at 13. Applying the indicia of custody articulated in *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990), we conclude that this is a close custody question but that Feltrop has failed to overcome the presumption of correctness. In addition, because Feltrop's initial incriminating statement was voluntary, his later confession, given after *Miranda* warnings, was admissible.

Thus, any *Miranda* error in admitting the initial ambiguous statement was harmless.

### B. Exclusion of a Defense Witness as Incompetent

■ Feltrop argues that the state trial court violated his right to compulsory process and to due process when it excluded testimony by Barbara Roam's six-year-old daughter that allegedly would have corroborated Feltrop's claim of self-defense. In general, a state court evidentiary ruling may not be the basis for federal habeas corpus relief unless it "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 72–73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (internal quotation omitted).

■ Under Missouri law, a child under ten years of age is presumed incompetent to testify unless the child "appears to the trial judge to have the capacity both to receive just impressions and to relate them truthfully." *State v. Williams,* 729 S.W.2d 197, 199 (Mo. banc), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); *see* Mo. Rev.Stat. 491.060(2). The determination of competence is left to the discretion of the trial judge. *State v. Robinson,* 835 S.W.2d 303, 307 (Mo. banc 1992). Here, following a competency hearing at which the daughter testified, the trial court found that she was incompetent generally and that the testimony she would offer would be incompetent regarding the issues at trial. The record of the competency hearing more than fairly supports these findings, so they are presumed correct. *See* 28 U.S.C. § 2254(d); *Nolan v. Armontrout,* 973 F.2d 615, 618 (8th Cir.1992); *cf. Maggio v. Fulford,* 462 U.S. 111, 117–18, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983) (competency to stand trial). The district court properly rejected this claim.

### C. Failure to Exclude Jurors for Bias

During voir dire, three prospective jurors admitted they had been influenced by pretrial publicity. After further questioning, the trial court denied Feltrop's motion to strike them for cause, and he then struck them using peremptory challenges. Feltrop argues that this violated his constitutional right

to a fair and impartial jury. This claim is without merit because there is no showing that the trial jury was not fair and impartial. "[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). Moreover, the Missouri Supreme Court found that all three prospective jurors "demonstrated an ability to be fair and to follow the law and instructions of the court," 803 S.W.2d at 8, a finding entitled to the presumption of correctness. *See Wright v. Lockhart,* 914 F.2d 1093, 1101 (8th Cir.1990), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1193 (1991).

## IV. Ineffective Assistance of Counsel Issues

■ A. Feltrop's main defense at trial was that he killed Roam in self defense after she attacked him with a knife. He argues that trial counsel rendered ineffective assistance by failing to also present expert medical testimony that he suffered from "battered spouse syndrome," both as a defense to first degree murder· and as a mitigating circumstance at the penalty stage.

Prior to trial, Feltrop pleaded the defense of insanity, and the State requested a pretrial psychological examination. Dr. Max Given examined Feltrop and reported that he had no mental defect that would excuse him from criminal responsibility. Feltrop's counsel moved for a second examination. Dr. A.E. Daniel examined Feltrop and agreed that he did not suffer from a mental defect but opined that his "state of mind, particularly as it relates to constant battering by the victim should be given some consideration as a mitigating factor when the degree of the offense is considered and later at the penalty stage." Feltrop then filed a notice of his intent to offer evidence of the battered spouse syndrome. However, he ultimately offered no medical evidence on this question at either the guilt or penalty stage.

At the post-conviction evidentiary hearing, Dr. Daniel Cuneo testified that he had examined Feltrop and reviewed the pretrial medical reports. Dr. Cuneo testified that Feltrop has a passive-aggressive personality disorder that would make him a target for abuse from the victim and also prone to "go into a rage reaction." He opined that the pretrial medical reports were consistent with his diagnosis and "could have been" presented during either stage of the trial. Feltrop's counsel testified that he initially planned to introduce medical evidence of spousal-type abuse by Roam but concluded that testimony by the examining doctors would seriously undermine the core defense of self defense because Feltrop had told all the doctors that he did not commit the crime:

Q Did you ever intend, once you had planned your trial strategy, to put Dr. Daniel on?

A I had considered the possibility of putting him on, I think, up until about two weeks prior to trial but did not.

Q Why?

A Because I wanted to present a consistent defense all the way through and that defense was self-defense, and [Feltrop] just told the doctor inconsistent facts with that. And so I thought that any good that would come from the doctor's testimony would be undercut and open to scathing cross examination by the prosecution, that would indicate a lack of remorse on his part and easily be inter[preted] that way. So whatever personality traits [Feltrop] had, I felt I could produce that through lay witnesses who had a good understanding of him, and I would not [incur] the problems that I would have with Dr. Daniel's testimony.

To succeed on a claim of ineffective assistance, Feltrop "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2055, 80 L.Ed.2d 674 (1984). The Missouri Supreme Court found that counsel investigated whether to use medical evidence of battered spouse syndrome in defense of the first degree murder charge and in mitigation of penalty; the Court concluded that "[counsel's] choice not to present expert testimony was based on reasonable trial strategy." 803 S.W.2d at 22. After considering the question of ineffective assistance *de novo,* the district

court agreed with this analysis, and so do we. Feltrop has failed to "overcome a strong presumption that his counsel's actions constituted reasonable trial strategy." *Sanders v. Trickey,* 875 F.2d 205, 207 (8th Cir.) (quotation omitted), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989); *see Laws v. Armontrout,* 863 F.2d 1377, 1389 (8th Cir. 1988) (en banc), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989).

B. Feltrop further argues that his trial counsel rendered ineffective assistance in declining the trial court's offer to declare a mistrial when the prosecutor commented on his failure to testify, and in refusing to allow Feltrop to testify, and that his appellate counsel was ineffective in failing to raise numerous issues on appeal. After careful review of the entire record, we agree with the district court and the Missouri Supreme Court that the challenged decisions by Feltrop's trial and appellate counsel were based upon reasonable strategy. *See* 803 S.W.2d at 20–22. Accordingly, these claims were properly denied.

### V. Prosecutor Misconduct Issues

 Feltrop claims that the prosecutor committed misconduct at various points during the trial that deprived Feltrop of a fair trial. He first argues that the prosecutor improperly commented on his failure to testify during the penalty stage closing arguments by stating:

> The Defendant is not entitled to receive from you what he so blatantly refused to give Barbara Roam, mercy and compassion. Dr. Case testified Barbara lived a minimum of fifteen minutes after the fatal wound, in that she was conscious. And that could have been as much as four hours. *The defendant was unable to refute that.*

(Emphasis added.) Indirect references to a defendant's failure to testify are violative of a defendant's constitutional rights only if they "(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally take them as a comment on the defendant's failure to testify." *United States*

*v. Montgomery,* 819 F.2d 847, 853 (8th Cir. 1987).

Here, the Missouri Supreme Court found that the prosecutor intended to refer to Feltrop's "failure to offer medical evidence to refute the state's expert testimony," not to his failure to testify. 803 S.W.2d at 13. The record supports that finding. Nor was the statement one that the jury would naturally take as a comment on Feltrop's failure to testify; rather, the prosecutor's focus was whether Barbara Roam had suffered prior to her death. This statement is not a basis for federal habeas corpus relief.

Feltrop also argues that the prosecutor made comments that "affected the jurors' perception of their responsibility," improperly elicited testimony of prior bad acts, "minimized the importance of the penalty phase" of the trial, and improperly personalized his closing argument to the jury. We have carefully considered the challenged comments in their various contexts. Like the district court, we conclude that the comments, if improper, did not "so prejudice [Feltrop] that he was unable to obtain a fair trial." *Carlson v. Minnesota,* 945 F.2d 1026, 1029 (8th Cir.1991).

### VI. A Procedural Bar Issue

 In his federal habeas corpus petition, Feltrop raised a number of claims not raised in his consolidated appeal to the Missouri Supreme Court but subsequently raised to that Court in his petition for state habeas relief and in his motion to recall the mandate. Feltrop argues that the district court erred in concluding that these claims are procedurally barred. We disagree. The claims were procedurally defaulted under Missouri law. *See Kennedy v. Delo,* 959 F.2d 112, 115–16 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 116 (1992) (claims first raised in motion to recall the mandate); *Byrd v. Delo,* 942 F.2d 1226, 1231–32 (8th Cir.1991) (claims first raised in state habeas petition). Feltrop argues that the ineffective assistance of his counsel during the state post-conviction proceedings excuses these procedural defaults. We have previously rejected that claim. *See Nolan,* 973 F.2d at 616–17.

## VII. Denial of an Evidentiary Hearing

■ The district court denied Feltrop's request for an evidentiary hearing on the ground that Feltrop had not shown either cause or prejudice for any failure to adequately develop relevant facts in the state court proceedings, as required by *Keeney v. Tamayo–Reyes*, —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Feltrop argues that this ruling was error because the cause-and-prejudice standard of *Tamayo–Reyes* applies only to claims that are otherwise procedurally barred. We disagree. The cause-and-prejudice requirement of *Tamayo–Reyes* plainly applies to non-barred claims previously raised in state court. *See McCann v. Armontrout*, 973 F.2d 655, 658 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1342, 122 L.Ed.2d 724 (1993). Because Feltrop made no showing of cause and prejudice, the district court properly denied his request for an evidentiary hearing.

## VIII. Issues Raised Pro Se

In addition to the above claims raised by Feltrop's counsel, Feltrop has raised a number of additional claims in *pro se* briefs to this court. Many of these claims were not raised in the state courts and are procedurally barred. We have carefully considered the remainder and conclude they are without merit.

The judgment of the district court denying Feltrop's petition for a writ of habeas corpus is affirmed.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent because (1) Feltrop's incriminating statements should have been suppressed because they were taken in violation of his *Miranda* rights; and (2) the jury received an unconstitutionally vague aggravating circumstance instruction during the penalty phase of the trial.

## I. *Admission of Incriminating Statements*

I agree with the majority that the state court's finding that Feltrop was not "in custody" when he first made an incriminating statement is entitled to a presumption of correctness. In my view, however, the presumption is overcome by the undisputed facts.

Ron Speidel, a sergeant with the Jefferson County Sheriff's Department, testified that on March 16, 1987, Feltrop visited the sheriff's office to make a missing person's report concerning Barbara Roam. Feltrop stated that Roam had disappeared a week earlier and that he did not immediately report her missing because in the past she had sometimes disappeared but always returned home within several days. Speidel told Feltrop to wait a few days and then return to the sheriff's office if Roam had not yet come home.

On March 23, 1987, Speidel was again on duty when a fellow officer informed him that Roam's mother had reported her missing. Speidel recalled his recent meeting with Feltrop and also remembered a local news broadcast that had reported that an unidentified torso had been found in St. Charles County. The broadcast showed a composite drawing of a person who was seen near an automobile parked on the road near where the torso was found. A copy of the composite was in the hallway of the sheriff's department, and Speidel stated that he believed the composite looked "identical" to Feltrop. Tr. 119. When Speidel was asked at the suppression hearing whether he "suspected" Feltrop after seeing the composite on television, he replied, "sure." Tr. 124.

Speidel then called the St. Charles County Sheriff's Department and reported that the composite drawing looked like Feltrop, the man who had first reported Roam missing. St. Charles officers asked Speidel to call Feltrop and arrange for Feltrop to meet with them.

Speidel went to Feltrop's trailer home several times but did not find him home. Speidel left his card with a neighbor and asked him to have Feltrop call. Feltrop telephoned Speidel and said he would be in as soon as possible. Feltrop drove his own vehicle to the Jefferson County Sheriff's Department, but Speidel did not recall whether he went to Feltrop's home and followed Feltrop as he drove to the sheriff's office. Feltrop arrived sometime between 8:00 p.m. and 9:00 p.m.

While there is a dispute in the record as to the time the St. Charles County officers arrived at the Jefferson County headquarters, according to deputies from the St. Charles County Sheriff's Department, four of their officers arrived at the Jefferson County headquarters at 10:30 p.m. Thus, Feltrop was in the Jefferson County headquarters for at least an hour and a half before the St. Charles County officers arrived. During this time he was not told that he was free to leave. Rather, the Jefferson County officers made it clear to him that he was to await the arrival of the St. Charles officers.

David Kaiser, an investigator for St. Charles County, and Sheriff Eubinger were the primary interrogators of Feltrop. The interrogation began at approximately 11:45 p.m. and was conducted in a small room at the back of the Jefferson County headquarters. It is conceded that Feltrop was not read his *Miranda* rights prior to the interview. The initial interview lasted until approximately 1:10 or 1:20 a.m. Near the end, Kaiser told Feltrop that he was pretty sure the severed torso that had been found in St. Charles County was Roam, and he wanted to know how the torso got there. Feltrop did not respond. Kaiser then asked Feltrop if he was a Christian, and Feltrop responded that he had been raised that way. He then stated that he had tried to take the knife away from Roam. This statement clearly inculpated Feltrop. Only then did Kaiser leave the room and suggest to his supervisor, Lieutenant Simcox, that Feltrop be given his *Miranda* rights. Simcox agreed, and Kaiser advised Feltrop of his *Miranda* rights, but by then the damage had been done.

Feltrop spent nearly three hours in the small room at the sheriff's office waiting to be interviewed, and an additional hour and a half being interviewed by Kaiser and the sheriff. During this time he was clearly a suspect, and there is no credible evidence in the record to support the view that Feltrop was free to leave the premises at any time during the interview. While there is evidence that Feltrop left the interview room when he was escorted to the restroom and that the officers brought him a soda, there is no evidence to support the view that he was free to leave the premises. To the contrary, no one even suggested to Feltrop that he was free to leave the premises, let alone told him so explicitly. By the words and actions of the interviewers and the nature of the interview, the only reasonable conclusion one can draw is that Feltrop was not free to leave the premises and that his *Miranda* rights were violated.

The Missouri Supreme Court stated in *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo.), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), that Feltrop himself assumed he was free to go because "he asked to drive his own vehicle to the discovery site of the body parts so that he could later return home in time to go to work." The fact is that Feltrop rode to the site in a law enforcement vehicle driven by Sgt. Speidel, with another officer riding in the back seat. Only then was he *formally* placed under arrest.

I do not believe that *Stansbury v. California*, —— U.S. ——, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), buttresses the State's position. In *Stansbury,* the Court stated that "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Id.* at ——, 114 S.Ct. at 1529. Here Feltrop was a suspect and could not have reasonably understood that he could leave during the course of the interview.

In my view, the failure to suppress Feltrop's inculpatory statements entitles him to a new trial. It may be, of course, that the State would have sufficient evidence on retrial to convict him even without these statements. I conclude only that the State must procure such conviction without the use of statements obtained in violation of Feltrop's constitutional rights.

II. *Aggravating Circumstance Instruction*

I also maintain that, even if Feltrop's conviction stands, the case must be remanded for resentencing because the jury's decision to impose the death penalty rested on an invalid aggravating circumstance. At the penalty phase of the trial the jury received a single instruction on aggravating circumstances. Instruction No. 4B stated:

In determining the punishment to be assessed against the defendant for the murder of Barbara Ann Roam, you must first unanimously determine whether the following aggravating circumstance exists:

Whether the murder of Barbara Ann Roam *involved torture and or depravity of mind* and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman.

(Emphasis added.) In fixing punishment at death, the jury found the following aggravating circumstance beyond a reasonable doubt: "the murder of Barbara Ann Roam *involved depravity of mind* and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman." (Emphasis added.) This finding was handwritten and signed by the jury foreman on the verdict form, as required by Missouri law. The jury clearly found the existence of "depravity of mind" and made no finding of "torture" despite being given the opportunity to do so.

The Missouri Supreme Court itself has rejected as inadequate this bare instruction on "depravity of mind." In *State v. Preston*, 673 S.W.2d 1, 10–11 (Mo.), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), it stated that "[t]he danger of wafting 'depravity of mind' without proper tethers is manifest: that circumstance could be utilized as a 'catchall' for murders not falling into any other statutory aggravating circumstances," citing *Godfrey v. Georgia*, 446 U.S. 420, 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980). The supreme court noted "the mandate of *Godfrey* to establish 'clear and objective standards' as to what types of murders constitute 'depravity of mind' " in order to prevent arbitrary or capricious infliction of the death penalty. 673 S.W.2d at 10–11. Despite this acknowledgement of the need to further define "depravity of mind," the jurors at Feltrop's trial in 1988 were never given any narrowing construction to channel their discretion in determining Feltrop's sentence.

The majority holds that the defective "depravity of mind" instruction was "cured" in the first instance by the trial judge in his role as "final sentencer" and, second, by the Missouri Supreme Court's independent review of the evidence supporting Feltrop's conviction and sentence. I respectfully disagree.

The conclusion that the trial judge "cured" the defective instruction rests on the determination by the Missouri Supreme Court that (1) the judge acted as the "final sentencer" due to his power under Missouri Rule of Criminal Procedure 29.05 to reduce a sentence as excessive; and (2) the judge is presumed to have known and applied the law, specifically the relevant factors enunciated in *Preston*. *Feltrop*, 803 S.W.2d at 15–16.

It is indeed true that there is no constitutional right to a jury-imposed sentence and that "there are many constitutionally permissible ways in which States may choose to allocate capital-sentencing authority." *Espinosa v. Florida*, —— U.S. ——, ——, 112 S.Ct. 2926, 2929, 120 L.Ed.2d 854 (1992); *see also Clemons v. Mississippi*, 494 U.S. 738, 746, 110 S.Ct. 1441, 1447, 108 L.Ed.2d 725 (1990). Mere declaration by the state supreme court that a particular party is the "final sentencer," however, is not sufficient. It is the task of the federal court to determine how a capital sentencing scheme operates in fact, *i.e.*, whether the judge, the jury, or a combination of both, acts as "sentencer" for Eighth Amendment purposes.

In *Espinosa* the State of Florida cited the authority of the Florida Supreme Court in *Smalley v. State*, 546 So.2d 720, 722 (Fla. 1989), to argue that the jury was not the "sentencer" for Eighth Amendment purposes because the jury only made a sentencing recommendation and the trial judge thereafter independently weighed aggravating and mitigating circumstances to arrive at a sentence of death or life imprisonment. —— U.S. at ——, 112 S.Ct. at 2928. Therefore, the State argued, no harm resulted from the jury's consideration of an unconstitutional aggravating circumstance instruction. *Id.* In ruling against the State, the Supreme Court examined the actual requirements and operation of the State's capital sentencing regime to see which actor played what role in sentencing and the constitutional implications of that allocation of sentencing authority. *Id.* at ——–——, 112 S.Ct. at 2928–29; *see also Beltran–Lopez v. State*, 626 So.2d 163, 164 (Fla.1993) ("In *Espinosa*, the United States

Supreme Court rejected our analysis in *Smalley* based upon its view that Florida has essentially split the death penalty weighing process between the jury and the trial judge.")

Examination of Missouri's sentencing scheme shows that, with some exceptions not applicable here, the Missouri legislature has given the jury the task "to assess and declare the punishment" at death or life imprisonment.[1] Mo.Rev.Stat. § 557.036.2. The fact that Missouri Rule of Criminal Procedure 29.05 permits the judge to reduce the punishment assessed by the jury "if [the judge] finds that the punishment is excessive" does not convert Missouri's capital sentencing scheme into "judge sentencing" rather than "jury sentencing" for purposes of constitutional analysis. As Chief Justice Blackmar noted in dissent in the Missouri Supreme Court's *Feltrop* opinion, "[i]t would be equally logical to argue that the governor acts as 'final sentencer' according to § 565.020.2, RSMo, which grants the governor power to 'release' the defendant." 803 S.W.2d at 22 (Blackmar, C.J., concurring in part and dissenting in part). Rule 29.05 is designed to be a posttrial safeguard against excessive jury verdicts. It does not supplant the jury's preeminent role in sentencing capital defendants.

Additionally, it is not logical under the circumstances of this case to apply any presumption that the trial judge knew and applied *Preston*'s limiting construction. The judge in fact permitted the jury to receive an aggravating circumstance instruction that did not contain the limiting factors and thus was unconstitutionally vague. To presume that the judge knew the law is to say that he deliberately gave a capital sentencing jury a defective instruction despite his awareness of its constitutional infirmity. I decline to adopt such a conclusion.

Moreover, the record gives no indication that the trial judge applied the *Preston* limiting factors. The brief memorandum denying Feltrop's Rule 29.05 motion for reduction of sentence nowhere mentions those factors. *State v. Feltrop*, No. CR187–219–FX–J2 (Jefferson Cty. Cir. Ct. Aug. 3, 1988) (memorandum). Nor does the transcript of the 29.05 hearing show any acknowledgement by the judge that he realized his instructional error. The judge merely stated, "On the defense counsel's rather eloquent plea for reduction of sentence, the Court has listened attentively to that and has recalled the testimony and the evidence in this cause, and the Court will overrule the Motion for Reduction of Sentence at this time." Tr. 1564. Any presumption that the trial judge knew and correctly applied the limiting construction has been rebutted by the facts of this case.

I also conclude that the defective aggravating circumstance instruction was not "cured" by the Missouri Supreme Court in its review of Feltrop's conviction and sentence. The majority holds that the state appellate court independently "cured" the trial court's instructional error by finding "depravity of mind" using the narrow *Preston* standard. It cites the authority of *Walton v. Arizona*, 497 U.S. 639, 653–54, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990), which states that when the trial judge rather than the jury is the sentencer, the judge is presumed to know and apply any limiting construction, and even if the judge fails to properly apply the law, "a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined." The majority further concludes that the state supreme court was not required to do a harmless error analysis or to reweigh the "depravity of mind" circumstance against the mitigating evidence because Missouri is not a "weighing" state.[2]

---

**1.** The court rather than the jury assesses the punishment when the defendant has so requested prior to trial; the defendant is a prior offender, persistent offender, dangerous offender, or persistent misdemeanor offender; or the jury cannot agree on the punishment.

**2.** In a recent opinion, *LaRette v. Delo*, 44 F.3d at 687 n. 4 (8th Cir.1995), this court stated that we

recognized in *Battle v. Delo*, 19 F.3d 1547 (8th Cir.1994), and *Mathenia v. Delo*, 975 F.2d 444 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993), that the Missouri Supreme Court definitively construed its capital sentencing statute as a non-weighing statute in cases such as *State v. Shaw*, 636 S.W.2d 667 (Mo.), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982), and *State v.*

First, as discussed above, I reject the view that the judge rather than the jury is the "sentencer" under Missouri's capital sentencing scheme. In addition, it is clear that one step in this scheme requires the jury to weigh aggravating and mitigating circumstances, and therefore the Supreme Court precedents applicable to "weighing" states apply to the issue presented here.

The majority cites *Zant v. Stephens*, 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983), to define a "non-weighing" capital sentencing procedure as one in which "the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." *Zant* examined the sentencing regime of Georgia, upon which Missouri's system was based. The Supreme Court again discussed Georgia's sentencing scheme, in comparison to Mississippi's "weighing" system, in *Stringer v. Black*, 503 U.S. 222, 228–30, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992) (quoting *Zant*, 462 U.S. at 872, 103 S.Ct. at 2740):

> Under Mississippi law, after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence. By contrast, in Georgia the jury must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case. Instead, under the Georgia scheme, "in making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial."

Unlike Georgia, however, Missouri's sentencing procedure includes a "weighing" step. Missouri requires a jury to go through specific steps to establish a defendant's pred-

icate eligibility for the death penalty before the jury may take the ultimate step of determining whether to assess that penalty. First the jury must find at least one statutory aggravating circumstance beyond a reasonable doubt. Mo.Rev.Stat. § 565.030.4(1); Instruction No. 4B. If it does so, the jury must then find that the aggravating circumstances "warrant imposing the death sentence." Mo.Rev.Stat. § 565.030.4(2); Instruction No. 5B. The next step in establishing eligibility requires the jury to find beyond a reasonable doubt that the mitigating circumstances are not "sufficient to outweigh the aggravating circumstance or circumstances." Mo.Rev.Stat. § 565.030.4(3); Instruction No. 6B. Only if these requirements are satisfied does the jury proceed to decide "under all of the circumstances" whether "to assess and declare the punishment at death." Mo.Rev.Stat. § 565.030.4(4); Instruction No. 7B.

Feltrop's jury received a single aggravating circumstance instruction, which asked whether the murder "involved torture and or depravity of mind." The jury found only that the murder involved "depravity of mind"; it did not find "torture." It is undisputed that the "depravity of mind" instruction the jury received was unconstitutionally vague, and it is equally clear that this defective instruction tainted the jury's assessment of Feltrop's punishment. At a crucial step in the sentencing proceedings the jury was instructed that it "must return a verdict fixing defendant's punishment at imprisonment for life ... without eligibility for probation or parole" if it finds that "one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstance found by you to exist." Instruction No. 6B. Having specifically excluded "torture" as an aggravating circumstance, the jury's ultimate choice to impose the death penalty rested on the concededly erroneous instruction concerning "depravity of mind." In making this choice, the jury decided that any mitigating circumstances pertaining to Feltrop or the murder did not "outweigh" the undefined "depravity of mind" involved in the murder.

*Bolder*, 635 S.W.2d 673 (Mo.1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983

(1983). I disagree that these cases stand for that proposition.

It is clear then that a jury in Missouri cannot discharge its duty "to assess and declare the punishment" without undertaking a "weighing" process as a component of the capital sentencing scheme. As the Supreme Court stated in *Espinosa*, reiterating its earlier holdings, "the weighing of an invalid aggravating circumstance violates the Eighth Amendment." —— U.S. at ——, 112 S.Ct. at 2928. No actor who has capital sentencing authority is permitted to weigh, even indirectly, a defective aggravating circumstance. *Id.* The death sentence assessed by Feltrop's jury cannot stand because it was tainted by the invalid "depravity of mind" instruction.

Furthermore, even if the instructional error is susceptible of correction by a state appellate court by reweighing the factors or by conducting a harmless error analysis, *see Sochor v. Florida*, —— U.S. ——, ——, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326 (1992), it is undisputed that the Missouri Supreme Court here did neither. At oral argument the State urged this court to find that the state supreme court's findings of sufficient evidence in the record to support "depravity of mind" using the *Preston* factors gives rise to a presumption of reweighing. I see no authority for doing so.

In sum, I would hold that Feltrop is entitled to a new trial because his incriminating statements should have been suppressed. Even if his conviction stands, I would remand the case for resentencing due to the erroneous aggravating circumstance instruction that the jury relied upon in fixing Feltrop's sentence at death rather than life imprisonment.