No. 93-2738

Ralph C. Feltrop,                    *
                                     *
    Plaintiff-Appellant,         *   Appeal from the United States
                                     *   District Court for the
    v.                           *   Eastern District of Missouri
                                     *
Michael Bowersox,                    *
                                     *
    Defendant-Appellee.          *

Submitted: March 1, 1996

Filed: August 8, 1996

Before FAGG, HEANEY, and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Missouri death row inmate Ralph C. Feltrop was convicted of murdering and dismembering his live-in girlfriend, Barbara Ann Roam. The Missouri Supreme Court affirmed the conviction and death sentence, and the denial of Feltrop's petition for state post-conviction relief, in State v. Feltrop, 803 S.W.2d 1 (Mo. banc), cert. denied, 501 U.S. 1262 (1991). We later affirmed the denial of his numerous claims for federal habeas corpus relief. Feltrop v. Delo, 46 F.3d 766 (8th Cir. 1995).

In rejecting Feltrop's claim that the police violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), we gave deference to the state court determination that he was not "in custody" prior to receiving Miranda warnings, consistent with prior Eighth Circuit cases construing 28 U.S.C. § 2254(d) (1994). 46 F.3d at 773. The Supreme Court granted certiorari, vacated our judgment, and remanded for further consideration in light of Thompson v. Keohane, 116 S. Ct. 457 (1995), in which the Court held

that the question of whether one is in custody for <u>Miranda</u> purposes must be reviewed *de novo*. <u>Feltrop v. Bowersox</u>, 116 S. Ct. 559 (1995). We have now reviewed supplemental briefs from the parties and considered that issue *de novo*. We again conclude that Feltrop is not entitled to federal habeas corpus relief.

**A. The Incriminating Statements.** Prior to trial, Feltrop moved to suppress incriminating statements he made to police on the night of March 23, 1987. The trial court held a suppression hearing at which law enforcement officers testified to the events in question. The parties divided Feltrop's incriminating statements into three categories: first, a statement that he tried to take a knife from Roam's hands, which caused the officers to interrupt the interview and give Feltrop <u>Miranda</u> warnings; second, his subsequent description of the killing and dismembering, after which he led police to the secluded farm pond where he had disposed of Roam's head, hands, and feet; and third, a videotaped confession Feltrop gave after returning from the farm pond. The trial court admitted the first statement because it was non-custodial, admitted the subsequent statements because they were made voluntarily following <u>Miranda</u> warnings, but suppressed those portions of the videotaped confession that followed Feltrop's request that a lawyer be present. At trial, Feltrop renewed his motion to suppress all his statements, based upon the officers' trial and suppression hearing testimony.[1] The trial court denied that motion, and the Missouri Supreme Court affirmed.

---

[1] Though he testified on another subject at the omnibus motion hearing, Feltrop did not testify concerning <u>Miranda</u> issues at that hearing or at trial. He did testify at the state post-conviction hearing, and his testimony radically contradicted the earlier testimony of the police officers concerning the events surrounding his incriminating statements. The state courts did not consider this testimony because suppression issues must be taken up on direct appeal. Although Feltrop has cited his post-conviction testimony in briefs to this court, he has given us no legal basis for considering it, and we may not do so. <u>See</u> <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 10-12 (1992).

-2-

**B. The Relevant Custody Facts.**  In conducting our *de novo* review of the custody issue, the first task is to determine the factual circumstances surrounding the questioning -- to set the scene and reconstruct the players' lines and actions.  "State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d)."  Thompson, 116 S. Ct. at 465.[2]  When the state trial court has conducted an adequate factual inquiry but has not made specific fact findings, as in this case, we apply the presumption of correctness to the Missouri Supreme Court's reconstruction of the events in question.  See Sumner v. Mata, 449 U.S. 539, 547 (1981).

On March 16, 1987, shortly after a dismembered female torso was found in St. Charles County, Feltrop visited the Sheriff's Department in nearby Jefferson County, where he and Roam resided, and reported to Sergeant Speidel that Roam had been missing for a week.  One week later, Sgt. Speidel decided that the torso found in St. Charles County could fit the missing person description of Roam, and that a police composite of a man seen near the torso's site resembled Feltrop.  The Missouri Supreme Court described the subsequent events as follows:

> The record shows that late in the afternoon on March 23, 1987, Sgt. Speidel contacted the St. Charles County Sheriff's Department, who asked him to arrange an interview with [Feltrop].  After contacting [Feltrop], Sgt. Speidel went to [Feltrop's] house.  [Feltrop] then followed Sgt. Speidel to the station.  Sgt. Speidel and [Feltrop] arrived at approximately 8:30 p.m., and [Feltrop] waited in the watch commander's office until the St. Charles officers arrived between 10:30 and 11:30 p.m.  Sheriff Eubinger and Sgt. Kaiser questioned

---

[2]Congress strengthened the presumption of correctness in Title I, § 104, of the Anti-Terrorism and Effective Death Penalty Act of 1996.  See Pub. L. No. 104-132, tit. I, sec. 104(3)-(4), 110 Stat. 1214, 1219, to be codified at 28 U.S.C. § 2254(d)-(e).  Even if this new statute governs this pending case, as Title I, § 107(c), might suggest, it does not affect our determination of the "in custody" question of law that the Supreme Court has remanded.

-3-

[Feltrop] from 11:45 p.m. to 1:10 a.m.  The officers asked [Feltrop] about his relationship with the victim, why he reported her missing, and where he thought she might be.  During this time [Feltrop] seemed tired and emotional, and cried periodically.  Finally, the officers asked [Feltrop] whether he was a Christian and whether he would tell the truth.  [Feltrop] then told the officers that he had "tried to take the knife away."  At that time [he] became a suspect and was read his Miranda rights, which he waived.  Questioning resumed.  [Feltrop] related his version of the events.  He claimed he killed Roam in self-defense.  Later [Feltrop] led the officers to the remaining body parts.  Using this information, the officers obtained a warrant to search [Feltrop's] home and seized evidence found therein.

* * * * *

[The questioning] officers engaged in no coercive conduct.  They made no promises or threats.  [Feltrop] was given drinks and opportunities to use the restroom and to take breaks.  Although the room in which [he] was interviewed was small, there is no indication that [Feltrop] was psychologically or otherwise coerced as a result of being in close quarters.

* * * * *

[Feltrop] voluntarily followed Sgt. Speidel to the station.  At all times prior to his making the incriminating statement, [he] was free to depart.

803 S.W.2d at 12-13.  We have carefully reviewed the state court record and conclude that these facts must be presumed correct.  We note that Feltrop did not seek an evidentiary hearing in federal court to revisit these events.

**C. The Custody Question of Law.**  Feltrop made the statement that he "tried to take the knife away" from Roam before he was given Miranda warnings.  That statement is inadmissible if he was in custody at the time he made it, because Miranda warnings must be given "where there has been such a restriction on a person's freedom as to render him 'in custody.'"  Oregon v. Mathiason, 429

-4-

U.S. 492, 495 (1977). Whether Feltrop was "in custody" is determined by an objective test -- viewing the totality of the circumstances, would a reasonable person in Feltrop's position have considered his freedom of action restricted to the degree associated with a formal arrest. See Thompson, 116 S. Ct. at 465-66 & n.13; California v. Beheler, 463 U.S. 1121, 1125 (1983). That the questioning takes place in a police station is relevant but not controlling. Mathiason, 429 U.S. at 495. Moreover, the subjective *undisclosed* beliefs of Feltrop and the questioning officers regarding custody are irrelevant. See Stansbury v. California, 114 S. Ct. 1526, 1529 (1994). Thompson requires us to apply this objective test *de novo* to the facts found by the state courts.

Feltrop came voluntarily to the Jefferson County police station to be interviewed by the St. Charles County investigators. For the first two hours after he arrived, Feltrop waited in the small watch commander's office with Sgt. Speidel, while Speidel attended to his unrelated watch commander's duties. Speidel testified at trial:

Q  Was [Feltrop] able to walk freely around the office?

A  No.  We have restricted areas in the office.  <u>But, he was free to move.  If he wanted to leave, he could have.</u>

(Emphasis added.) Speidel did not question Feltrop. This portion of the time Feltrop spent at the station was clearly non-custodial.

When the St. Charles County investigators arrived, Sgt. Speidel allowed them to interview Feltrop in the watch commander's office while Speidel worked elsewhere in the station. Two investigators interviewed Feltrop in the small office while two others listened to the wired conversation in another room. When the interview began, the female torso discovered in St. Charles

-5-

County had not been identified. Feltrop had reported Roam missing, and one week later Sgt. Speidel asked if Feltrop would meet with the St. Charles County investigators. During the interview, Feltrop was emotional about his missing girlfriend, but that alone would not establish that he was concealing guilt. Thus, the setting is entirely consistent with a non-custodial interview of someone who may be able to shed light on an unsolved crime but may not be subjected to the restrictions of a formal arrest. True, the interview questions were designed to elicit incriminating responses if Feltrop were guilty, but he was free to leave at all times prior to his incriminating statement, and he was treated with the consideration due one who has volunteered to be interviewed, the "kind of latitude [that] is clearly inconsistent with custodial interrogation." United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989).

It is easy to say in hindsight that Feltrop was an obvious target of the investigation. But until he made an incriminating statement about 1 1/2 hours into the interview, there was no probable cause to arrest him, and the investigators had not curtailed his freedom of action to a degree associated with formal arrest.[3] When Feltrop made that first obscure but clearly incriminating statement -- he "tried to take the knife away" from Roam -- the investigators immediately gave him Miranda warnings and a lengthy break in the questioning. In these circumstances, although the issue is close, we conclude that Feltrop was not "in custody" prior to receiving those warnings.

_____

[3]As the Missouri Supreme Court noted, Feltrop's conduct later that night suggested that he did not consider the interview custodial: "after [Feltrop] confessed, he apparently assumed he was free to go; he asked to drive his own vehicle to the discovery site of the body parts so that he could later return home in time to go to work." 803 S.W.2d at 13. Cf. United States v. Klein, 13 F.3d 1182, 1184 (8th Cir.), cert. denied, 114 S. Ct. 2722 (1994).

-6-

**D. The Harmless Error Question.**  Feltrop not only argues that his first incriminating statement is inadmissible, but he also asserts that his later confession must be suppressed as the tainted fruit of that poisonous tree.  We disagree.  In Oregon v. Elstad, 470 U.S. 298, 309 (1985), the Supreme Court held, "Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement [made after Miranda warnings are given] should turn . . . solely on whether it is knowingly and voluntarily made."  Feltrop's subsequent description of the killing and his decision to lead police to the remainder of Roam's body "were not the product of unconstitutional coercion."  46 F.3d at 772. Those statements and conduct are admissible and were infinitely more incriminating than his initial incriminating statement.  Therefore, any Miranda error in admitting that initial statement was harmless beyond a reasonable doubt.  See United States v. Robinson, 20 F.3d 320, 322-23 (8th Cir. 1994).

For the foregoing reasons, we reinstate our prior decision affirming the district court's denial of Feltrop's petition for a writ of habeas corpus.

HEANEY, Circuit Judge, dissenting.

It is clear that I conceded too much in my original dissent.  I agreed with the original majority that the state court's finding that Feltrop was not in custody when he made his first incriminating statement was entitled to a presumption of correctness.  Now, in light of the Supreme Court's recent holding that this "ultimate 'in custody' determination" is subject to de novo review, Thompson v. Keohane, 116 S. Ct. 457, 465 (1995), I even more resolutely believe that police obtained Feltrop's initial statement in violation of his Miranda rights.  In my view, we must reverse the United States District Court and direct that court to remand to the state court with directions to release Feltrop or to give him a new trial within a reasonable period of time.

In this case, the presumption of correctness with respect to the state court's determination of the factual circumstances is overcome by the state court's omission of undisputed, relevant facts. While I do not quarrel with--and presume correct--the facts set out by the state court, the facts which are not set out by the state court cause me significant trouble. Therefore, unlike the majority, I do not believe we can properly meet our obligation to conduct an independent review of the circumstances of Feltrop's interrogation by simply relying on the factual statement as provided by the state court.

In my view, the essential, undisputed missing facts are as follows:

1. Sergeant Speidel suspected that Feltrop was involved in Barbara Roam's death when he contacted Feltrop for questioning. (Trial Tr. at 124.) The Missouri Supreme Court was either speaking hyper-technically or simply wrong in stating that Feltrop only became a suspect after he offered his initial admission that a struggle occurred between he and the victim. See State v. Feltrop, 803 S.W.2d 1, 12 (Mo.), cert. denied, 501 U.S. 1262 (1991). It is undisputed that Sergeant Speidel connected Feltrop, who had recently reported his girlfriend missing to Sergeant Speidel, with a composite drawing of a person seen near the site where an unidentified torso was discovered in St. Charles County. (Trial Tr. at 998-1001, 1004, 1019.) Sergeant Speidel even testified that he suspected Feltrop committed a crime related to his girlfriend's disappearance.

2. Sergeant Speidel reported his suspicions to the St. Charles Sheriff's Department, who asked him to contact Feltrop and arrange a meeting between their investigators and Feltrop. (Id. at 1005.) Sergeant Speidel went to Feltrop's home several times, but could not find him. (Id.) He then left his business card with a neighbor, asking that Feltrop call him. (Id. at 1007.) Later that

night, Sergeant Speidel returned to Feltrop's home and told him that the only way he could obtain any information about his missing girlfriend was if he went with Sergeant Speidel to the police station that night. (Id. at 1021-22). Feltrop drove his car to the Jefferson County Sheriff's Department, escorted by Sergeant Speidel. (Id. at 1022).

3. When Feltrop arrived at the Jefferson County Sheriff's Department, he was placed in a small, nine-foot-by-nine-foot room and kept there for at least two hours until the St. Charles County investigators arrived. (Trial Tr. 125-26). During this time, he was never told he was free to leave.

4. The interview lasted from approximately 11:45 p.m. until 1:10 a.m. or 1:20 a.m. Near the end of the interview, Kaiser, a St. Charles County investigator, told Feltrop that he was pretty sure the severed torso that had been found in St. Charles County was Roam and he wanted to know how the torso got there. (Trial Tr. at 1048-50).

In addition to omitting essential facts, the majority mischaracterizes several conclusions of the Missouri Supreme Court as factual findings. For example, the state court's determinations that (1) Feltrop voluntarily followed Sergeant Speidel to the station and (2) he was free to leave at all times prior to making the incriminating statement are conclusions, not findings of fact. The findings go well beyond "basic, primary , or historical . . . recital of external events and the credibility of their narrators." See Thompson, 116 S. Ct. at 464 (internal quotations omitted). The state court's ultimate conclusions are not entitled to a presumption of correctness and we must review them de novo.

When all relevant facts are considered and when the legal conclusions of the state court are set aside, it becomes apparent that no reasonable person in Feltrop's position would have believed

that he was free to leave and that his <u>Miranda</u> rights were violated. Therefore, I respectfully dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.