# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1480

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the District |
| v. | * | of Minnesota. |
| | * | |
| Robert Kilroy Galceran, | * | [PUBLISHED] |
| | * | |
| Appellant. | * | |

_____

Submitted: August 20, 2002

Filed: August 27, 2002

_____

Before HANSEN, Chief Judge, FAGG and BYE, Circuit Judges.

_____

PER CURIAM.

Robert Kilroy Galceran gave a statement to police implicating himself in a series of robberies. After his indictment, Galceran moved to suppress the statement, asserting he had been the subject of a custodial interrogation and had not been given the warning required by <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (when person is taken into custody for questioning, person must be advised of right against self-incrimination and right to attorney). The district court[*] concluded Galceran was not

_____

[*]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

in custody when he gave the statement, and thus no <u>Miranda</u> warning was required. The district court denied Galceran's motion to suppress, and Galceran conditionally pleaded guilty to one count of bank robbery in violation of 18 U.S.C. § 2113(a) and § 2. Galceran now appeals the denial of his motion asserting he was in custody when he gave the statement. We affirm.

During the investigation of a series of robberies, a police officer left his business card with Galceran's girlfriend and asked her to have Galceran call him. Galceran called the officer and told him that he knew about the robberies and that a man named "John" was involved. Galceran called the officer again three days later, and expressed concern about being arrested. The officer told Galceran he did not know of any arrest warrants issued for him. The officer also told Galceran he was not comfortable discussing the investigation over the phone, and asked Galceran if he would meet him to discuss the case in person. The officer assured Galceran he was not under arrest, would not be arrested that day, and the officer was simply trying to gather information about the robberies. Galceran agreed to come to the police station and met the officer there later the same day.

When Galceran arrived at the station, the officer asked Galceran to join him in the roll call room, an interior room with no windows, two doors, dry erase boards, no clock, and a large conference table and chairs. The officer asked Galceran whether he wanted food or drink or to use the restroom. After he declined, Galceran and the officer sat down at the conference table and began the interview. Another officer joined them about fifteen minutes later. One officer was seated at the head of the table, with Galceran on one side and the other officer on the other side. The officers were dressed in street clothes, but had their weapons with them. Both officers testified they did not consider Galceran to be in custody and thus did not read him his <u>Miranda</u> rights. The interview lasted about an hour and a half. During the course of the interview, Galceran detailed his and his partner's roles in a number of robberies. The entire interview was recorded on tape, except for about two minutes when the

tape ran out. At the end of the interview, Galceran signed a statement indicating he did not feel coerced or threatened during the interview. Galceran then left the police station without being arrested.

When reviewing whether Galceran's interrogation was custodial, "we uphold findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts" independently. United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002). A person is not in custody for Miranda purposes unless the person's "freedom of action is curtailed to a 'degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). We measure Miranda's custody requirement objectively, evaluating "how a reasonable [person] in the suspect's position would have understood [the] situation." Id. at 442. For the purpose of this evaluation, a reasonable person "does not have a guilty state of mind [or] . . . peculiar mental or emotional conditions that are not apparent to the questioning officer." United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000). We have identified several factors relevant to the custody evaluation, including: (1) whether the suspect was informed that the suspect was free to leave or that the suspect was not under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether police used strong-arm tactics or deceptive strategies during questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the suspect was arrested at the end of the questioning. United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). This list is not exhaustive, and no one factor is necessarily dispositive. Id.

Having examined the totality of the circumstances, we agree with the district court that Galceran was not in custody during the questioning. Galceran was repeatedly told, both before coming to the police station and during the questioning, that he would not be arrested that day. Galceran acknowledges that at the start of the

questioning, the officers told him he was free to leave and was not under arrest. Galceran argues the interrogation became custodial when he later asked to leave and the agents told him he had to finish answering their questions. We think Galceran mischaracterizes the conversation. After the officer stated, "I'm not planning on arresting you today," Galceran responded, "But if I tell you what I know you're gonna arrest me." The officer then reiterated, "You're walking out of here." Galceran stated, "I wanna go, he told me I could." After the officers explained a few more times that there would be no arrest that day and that "after we're done you can go and you can talk to Terry [the drug treatment director] and you can go," Galceran was finally convinced that he would not be arrested at the interview's conclusion, and he readily agreed to tell the officers his story "from the beginning . . . everything . . . you don't even have to ask questions." The exchange merely reflects Galceran's concern that he would be arrested following the interview, instead of being allowed to leave to enter his preferred drug treatment center. Further, Galceran's movements were not restricted during the interview as if he were under arrest. Thus, the first and second factors indicate Galceran was not in custody.

Third, Galceran voluntarily acquiesced to official requests to respond to questions. Although the officers wanted to speak with Galceran and told his girlfriend so, Galceran telephoned the officers to indicate he wanted to speak with them. Galceran called again three days later, and voluntarily drove to the police station to talk. Further, before going to the police station, Galceran told his mother and his girlfriend that he was going to turn himself in and tell the officers what had happened. During the interview, Galceran indicated he was participating voluntarily, stating, "There's no threats or promises, just . . . a hope . . . that if I did this it would maybe give me leniency and mercy with the judge."

Fourth, the district court found there was "no indication that the authorities coerced [Galceran] in any way," or otherwise used unlawful coercive interrogation techniques. This finding is not clearly erroneous. Galceran reads much into the fact

that one of the officers got called away to handle another matter for a few minutes, the tape recorder shut off during that time, and the remaining officer continued questioning. Nothing supports Galceran's contention that the officer intentionally turned off the tape recorder to strong-arm Galceran while the other officer was out of the room. Instead, the record shows the officer had not used the particular type of tape recorder before, realized it had shut off, switched tapes, then tried to restate for the record everything that had been discussed while the tape was off. Further, although the officers had weapons, they "did not adopt a threatening posture toward [Galceran], display their weapons, or make a physical show of force during the questioning." Axsom, 289 F.3d at 502.

Fifth, the interview's setting was not police dominated, even though the interview took place at a police station. The interview was not held in the station's holding cell area normally used for custodial interrogations, Galceran voluntarily agreed to appear for questioning at the station, and the ninety-eight minute length of the interview does not indicate police domination. E.g., United States v. Mottl, 946 F.2d 1366, 1367-68 (8th Cir. 1991). Miranda warnings need not be imposed simply because the questioning takes place in a police station. Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

Sixth, Galceran was not arrested at the interview's conclusion. Indeed, Galceran voluntarily returned to meet with the same officers on other occasions to discuss other crimes. Lack of arrest is a "very important" factor weighing against custody. United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991). In sum, the evidence shows Galceran was not in custody "or otherwise deprived of his freedom of action in any significant way." Mathiason, 429 U.S. at 495. Galceran came voluntarily to the police station, was repeatedly informed he was not under arrest, and left the police station without hindrance at the interview's conclusion. Id.

Galceran next contends his incriminating statements must be suppressed because they were involuntary and obtained in violation of his due process rights. According to Galceran, he was mentally ill and told the officers he was suicidal and had been hearing voices. Although mental condition is relevant to a suspect's susceptibility to police coercion, coercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause. Colorado v. Connelly, 479 U.S. 157, 165-67 (1986. Here, there is no evidence of coercive police activity, so Galceran's due process claim fails. Even if police were coercive, Galceran failed to show he suffered from a mental illness at the time of the interview that, when combined with coercion, produced a confession that was not a product of his own free intellect. Townsend v. Sain, 372 U.S. 293, 308 (1963). Indeed, the Government's evidence shows Galceran was rational and freely gave his statement. One officer testified Galceran was responsive in answering questions, knew where he was, what was going on, and what was happening, and provided details about the crimes. The officer's conclusion that Galceran was of rational mind during the interview is consistent with a psychiatrist's conclusion seven months later that Galceran was not then mentally ill. Because we conclude Galceran's statement was voluntary, we reject his related argument that his involuntary incriminating statements must be suppressed because they were inadmissible under 18 U.S.C. § 3501 (stating confessions are admissible in evidence if voluntarily given).

In sum, Galceran was not in custody when he gave incriminating statements, police did not coerce him, and the statements were voluntary. Thus, the district court properly denied Galceran's motion to suppress.

A true copy.

Attest:

      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.