# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 01-4005

_____

United States of America,          *

                           *

      Appellant,       *

                           *      Appeal from the United States

   v.                 *      District Court for the

                           *      Western District of Missouri.

Michael Edward LeBrun,     *

                           *          [PUBLISHED]

      Appellee.        *


_____

Submitted:   April 16, 2003
Filed:   April 9, 2004

_____

Before LOKEN, Chief Judge, McMILLIAN, BOWMAN, WOLLMAN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY, and SMITH, Circuit Judges.

_____

HANSEN, Circuit Judge.


After thirty-three minutes of questioning, Michael LeBrun confessed to naval investigators that in 1968, while he was enlisted in the United States Navy, he strangled to death his superior officer, Ensign Andrew Muns, on board the U.S.S. Cacapon after Ensign Muns caught LeBrun robbing the safe in the ship's disbursing office. The district court suppressed the confession on the ground that it was obtained in violation of LeBrun's Fifth Amendment privilege against self-incrimination as construed in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and on the

ground that it was coerced, and thus obtained in violation of LeBrun's due process rights. The government appealed, and a divided panel of this court affirmed the judgment of the district court. See United States v. LeBrun, 306 F.3d 545 (2002). We granted the government's petition for rehearing en banc, vacated the panel opinion, and for the reasons stated below, now reverse the judgment of the district court.

I.

Muns and LeBrun served as shipmates during the Vietnam War aboard the U.S.S. Cacapon. Ensign Muns served as the disbursing officer, and LeBrun served as the disbursing clerk. On January 16 or 17, 1968, while the U.S.S. Cacapon was moored in the Subic Bay, Muns disappeared. After conducting an investigation into Muns' disappearance, the Navy concluded that Muns had stolen $8600 from the disbursing office and had deserted. Thirty years later, still unconvinced of her brother's wrong-doing, Muns' sister convinced Special Agent Peter Hughes of the Naval Criminal Investigative Service ("NCIS") Cold Case Homicide Unit to reopen the investigation.

In the fall of 1999, NCIS agents conducted four interviews with LeBrun. On each of these four occasions, LeBrun cooperated with the investigators and voluntarily answered questions regarding Muns' disappearance. On three of these occasions, he was given his Miranda warnings by the interviewers. During an interview conducted on November 20,1999, LeBrun told NCIS agents that he realized that he may have been involved in the death and disappearance of Ensign Muns. LeBrun also told the agents that he felt that he had repressed memories, and he asked Agent Hughes if he knew of a therapist who could help LeBrun recover those memories. After completing the first round of interviews, the NCIS agents did not have any further significant contact with LeBrun for approximately ten months as they continued to investigate other leads. By September of 2000, however, the NCIS

2

had focused on LeBrun as the lead suspect in the case. At that time, NCIS agents decided to interview LeBrun again.

On September 21, 2000, NCIS Special Agent Early and Corporal Hunter of the Missouri Highway Patrol arrived unexpectedly at LeBrun's place of employment. Hunter told LeBrun that he and Early were conducting an investigation and requested that LeBrun accompany them to the Missouri Highway Patrol office to participate in an interview. Although the officers did not tell LeBrun the subject of their investigation, LeBrun agreed to accompany the officers because he thought that the officers might be investigating certain criminal allegations concerning LeBrun's employer. At the officers' suggestion, LeBrun rode in the front seat of an unmarked patrol car to the station house. The door was unlocked during the trip, and LeBrun was not restrained in any manner.

After they arrived at the patrol office, but before they went inside, Agent Early told LeBrun that he was not under arrest, that he was free to terminate the impending interview at any time, and that he was free to leave at any time. He was also told that he was subject to audio and visual recording anywhere inside the building. The officers then took LeBrun inside the office to a windowless interview room. The authorities had prepared the room prior to LeBrun's arrival, adorning the interview room walls with enlarged photographs of scenes from LeBrun's life. After LeBrun took a seat, NCIS Agents Early and Grebas identified themselves and initiated the interview. At no point immediately prior to or during the September 21, 2000, interview did the agents recite to LeBrun the Miranda warnings. The district court found that the decision not to warn was a conscious one made by the interviewers. Special Agent Early testified that no warning was thought necessary because it was not an under arrest custodial situation.

Despite the agents' failure to recite the Miranda warnings, LeBrun testified at the suppression hearing that at the time of the interview he understood what his

3

Miranda rights were. LeBrun also testified that at the time the interview commenced he believed that he was not in custody and that he was free to leave at any time. The government concedes that the officers used psychological ploys during the course of the interview to facilitate a confession. For example, the agents told LeBrun that he was the prime suspect in Muns' death and that they had significant evidence establishing that LeBrun was the killer. The agents also told LeBrun that a protracted trial in a distant district would drain his financial resources and would ruin his family's reputation. At no point, however, did the agents shout at LeBrun or use physical force against him. After approximately thirty-three minutes of questioning, LeBrun confessed to the crime. LeBrun explained that while he was robbing the safe, Ensign Muns walked into the disbursing office. He confessed that he rushed Muns and killed him by strangling him and then smashing his head against the deck of the disbursing office. At the agents' urging, LeBrun then physically reenacted the robbery and attack. He also explained how he had dumped Muns' body and the missing money into a tank of caustic fuel oil to dispose of the evidence.

After LeBrun confessed to the killing, Agents Early and Grebas asked whether he wanted to apologize to Muns' sister, Mary Lou Taylor, who had flown in from Milwaukee to assist in the interrogation if it became necessary. He indicated that he did. Dr. Taylor, accompanied by Agent Billington, who was posing as Muns' brother and whom the agents had told LeBrun was stricken with cancer, then entered the interview room. LeBrun acknowledged to Taylor and Billington that he was responsible for Muns' death, and he apologized. After the agents had completed their questioning, LeBrun consented to having his house searched. LeBrun then withdrew a cellular telephone from his pocket and called his spouse. The agents drove LeBrun to his house and searched it. After conducting their search, the officers left LeBrun at home. They did not arrest him that day.

LeBrun was arrested at a later date and charged with felony murder in violation of 18 U.S.C. § 1111. He moved to suppress his confession, arguing that it was

4

obtained in violation of Miranda v. Arizona and in violation of his due process rights. The district court agreed with LeBrun, concluding that he was "in custody" within the meaning of Miranda or, in the alternative, that his confession was coerced. The district court granted the motion to suppress, the government appeals, and we reverse the judgment of the district court.

II.

A.

Before turning to the merits of the district court's "in custody" determination, we must first resolve an intracircuit split concerning the standard of review we apply to such a determination. In Thompson v. Keohane, 516 U.S. 99 (1995), the Supreme Court held that federal habeas courts should review de novo state courts' "in custody" determinations. It seems clear to us that Thompson's rationale requires that on direct appeal we review the district court's custody determination de novo. See id. at 112-13 (stating that the ultimate "in custody" determination is a mixed question of fact and law calling for independent review). After Thompson, however, we have reviewed district court custody determinations de novo in some cases and for clear error in others. Compare United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) (applying de novo review), with United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001) (applying clear error standard of review); see also United States v. McKinney, 88 F.3d 551, 554 n.2 (8th Cir. 1996) (applying clear error standard of review but noting that it may be reconsidered in light of Thompson). As Judge Riley explained in Axsom, post-Thompson, our sister circuits have reviewed de novo the "in custody" determination. See Axsom, 289 F.3d at 499-500 (compiling cases). We are of the view that this is the better approach. Accordingly, we hold that "in reviewing 'in custody' determinations, we uphold findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts utilizing an independent review." Id. at 500. Our cases to the contrary are overruled.

B.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under traditional understandings, courts enforced the Fifth Amendment privilege by requiring the government to establish the voluntariness of a confession before it could be admitted into evidence against a criminally accused. Miranda, however, "changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements." Dickerson v. United States, 530 U.S. 428, 434 (2000). The Miranda Court "concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." Id. at 435 (internal marks omitted). To better protect this privilege, the Miranda Court created concrete constitutional guidelines which "established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with" certain warnings. Id. "[T]he person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. Not every confession obtained absent the Miranda warnings is inadmissible, however, because "police officers are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." Id.

The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal marks omitted). "Two

6

discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112 (footnote omitted). Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's "freedom to depart was restricted in any way." Mathiason, 429 U.S. at 495. In answering this question, we look at the totality of the circumstances while keeping in mind that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 322-23 (1994). After looking at the totality of the circumstances, we conclude that the district court erred in concluding that LeBrun was "in custody" within the meaning of Miranda.

We begin our analysis by discounting those facts that, in our view, bear little on the custody determination. First, it cannot be disputed that the warnings were not required here "simply because the questioning [took] place in the station house." Mathiason, 429 U.S. at 495. Second, we are of the view that the purportedly coercive aspects of this particular interview are largely irrelevant to the custody determination and that the district court erred in giving such great weight to certain facts, chiefly: that LeBrun was interviewed in a small, windowless room; that the authorities admittedly used deceptive interview tactics; that the interview was designed to produce incriminating responses as evidenced by the enlarged photographs on the wall; and that the agents falsely trumped up the evidence they said they possessed.

In Mathiason, an officer investigating a burglary interviewed the defendant for thirty minutes in a small, windowless interrogation room inside the police station. During the course of the interview, the officer told the defendant that he was a suspect and falsely told the defendant that the police had discovered his fingerprints at the scene of the crime. The Supreme Court of Oregon concluded that the coercive

aspects of the interview rendered the defendant in custody, thereby necessitating the warnings. The Supreme Court reversed, concluding that "a noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because . . . the questioning took place in a 'coercive environment.'" <u>Mathiason</u>, 429 U.S. at 495. It continued, stating that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." <u>Id.</u> Finally, the Court concluded that the officer's false statement that the police had evidence against the defendant had "<u>nothing</u> to do with whether [the defendant] was in custody for purposes of the <u>Miranda</u> rule." <u>Id.</u> at 496 (emphasis added).

In <u>California v. Beheler</u>, the Court revisited the issue of station house interviews. There, after being told that he was not under arrest, Beheler agreed to accompany the authorities from a crime scene to the police station for questioning. The authorities did not read Beheler the <u>Miranda</u> warnings before the interview started, and during the course of the interview, Beheler made incriminating statements. The authorities released Beheler and then arrested him several days later. The California Court of Appeals reversed Beheler's conviction, holding that the interview constituted custodial interrogation. In support of its conclusion that Beheler was "in custody," the court relied on facts similar to those on which the district court in this case relied: "that the interview took place at the station house, that before the station house interview the police had already identified Beheler as a suspect in the case because Beheler had discussed the murder with police earlier, and that the interview was designed to produce incriminating responses." <u>Beheler</u>, 463 U.S. at 1123. The Supreme Court reversed, concluding that "[i]t is beyond doubt that Beheler was neither taken into custody nor significantly deprived of his freedom of action. Indeed, Beheler's freedom was not restricted in any way whatsoever." <u>Id.</u>

8

Mathiason and Beheler teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart. See Mathiason, 429 U.S. at 495; see also Stansbury, 511 U.S. at 324-25 (stating that an officer's suspicion regarding a defendant and purpose for conducting an interview bear on the custody determination "only if the officer's views or beliefs . . . would have affected how a reasonable person in that position would perceive his or her freedom to leave").

Whatever coercion existed in this case was not of the sort that a reasonable person would perceive as restricting his freedom to depart. Indeed, the facts support the opposite conclusion. LeBrun was never physically restrained. He was never placed in handcuffs. The agents told LeBrun before the interview commenced that he was free to leave. LeBrun testified that he understood that he was free to terminate the interview and leave at any time. LeBrun had his cellular phone with him during the interview, and he called his wife from the interview room. While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained. See United States v. Unser, 165 F.3d 755, 766 (10th Cir.) (noting that use of a cellular phone during an interview is a factor supporting a finding of no custody), cert. denied, 528 U.S. 809 (1999). His cellular phone provided LeBrun a line of communication between himself and the outside world and to some extent mitigated the incommunicado nature of interrogations with which the Miranda Court was concerned and the psychological pressure associated with being isolated in an interview room. At the end of the interview, the agents did not arrest LeBrun but instead drove him to his home. See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (stating that the lack of arrest was a "very important factor weighing against custody").

9

The facts of this case are in all relevant respects indistinguishable from Mathiason and Beheler, and they dictate the conclusion that LeBrun was not in custody within the meaning of Miranda. Moreover, the indicia of custody present here are no greater than and the facts weighing against custody are no less than those in a host of other cases in which we have concluded that an interview was noncustodial. In Galceran, two armed police officers interviewed the defendant for approximately one and one-half hours in a small, windowless, interior room in a police station. As is the case here, the officers in Galceran repeatedly told the defendant that he was free to leave and that he would not be arrested that day. We concluded that the defendant was not in custody because, among other things, the officers told him that he was free to leave and that he would not be arrested that day and because he was in fact not arrested at the conclusion of the interview. See Galceran, 301 F.3d at 930-31. In Thatsaphone v. Weber, 137 F.3d 1041 (8th Cir.), cert. denied, 523 U.S. 1130 (1998), an officer conducted a closed-door, twenty-two-minute interview with the defendant at the police station. We concluded that Thatsaphone was not in custody because the officers told him that he was free to leave and because the officers did not arrest him that day. See Thatsaphone, 137 F.3d at 1044-46. In Jenner v. Smith, 982 F.2d 329 (8th Cir.), cert. denied, 510 U.S. 822 (1993), the defendant made statements to the police incriminating herself in the murder of her three-year-old daughter. Jenner made the statements during an approximately seven-hour interview conducted in a small room in the police station. During the course of the interview, an officer raised his voice on several occasions, accusing Jenner of lying. The officers also used a variety of psychological ploys to draw information from Jenner, including using religious appeals and intimating that her husband might be blaming her for the murder. We concluded that the interview was noncustodial in nature: Jenner voluntarily came to the police station, the authorities advised her that she was free to leave, and she was not arrested at the conclusion of the interview. See Jenner, 982 F.2d at 335. In United States v. Mottl, 946 F.2d 1366 (8th Cir. 1991), we concluded that an interview conducted at FBI

10

headquarters was noncustodial despite the agents' failure to inform the defendant at the outset of the interview that he was free to leave and free to terminate the interview at any time.  See Mottl, 946 F.2d at 1370.

As the analogous cases discussed above demonstrate, where there is no clear indication that the defendant's freedom to depart has been restricted, we have typically concluded that a police station interview was noncustodial.  There is contrary authority, however.  In United States v. Hanson, ATF agents arrived unannounced at Hanson's residence, awakened him, and transported him in the locked backseat of their vehicle to the federal building for further questioning.  The agents then questioned Hanson for several hours in a windowless, interior room before Hanson confessed his involvement in an attempted arson.  The Hanson court, over a vigorous dissent, concluded that the defendant was in custody and distinguished Mathiason on the ground that Hanson was dependent on the authorities for transportation from the federal building and on the ground that the agents interviewed the defendant for a significantly longer period of time than did the officers in Mathiason. See Hanson, 237 F.3d at 965. We think Hanson is readily distinguishable from this case.  First, unlike Hanson, who rode in the backseat of a locked vehicle, LeBrun's freedom of movement was never restricted in any way.  Second, the interview at issue here was of shorter duration.  Third, LeBrun was not dependent upon the authorities for transportation from the Highway Patrol Station.  LeBrun retained possession of his cellular phone during the entire interview, he was free to make and receive calls during the interview, and he could have easily arranged for alternative transportation by calling a coworker, a friend, a relative, his spouse, or even a taxicab.

Even if Hanson were not distinguishable, we are disinclined to follow it, for we are of the view that it is inconsistent with Mathiason and Beheler and that it was wrongly decided for the reasons articulated in the dissenting opinion in that case. Accordingly, we overrule Hanson.

11

Finally, an important fact present in this case but absent, or at least not discussed, in the aforementioned cases militates against a finding of custody. In our objective custody analysis, the relevant inquiry is not whether any random reasonable person would have determined that he was in custody, but whether a reasonable person in the <u>defendant's position</u> would have considered his freedom of action restricted to the degree associated with a formal arrest. <u>Feltrop v. Bowersox</u>, 91 F.3d 1178, 1181 (8th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1242 (1997). LeBrun's age; work experience; education, specifically his legal training; and his past experience with NCIS agents weigh against custody. <u>See</u> <u>United States v. Rorex</u>, 737 F.2d 753, 756 (8th Cir. 1984) (stating that the age and experience of the interviewee is a relevant factor in the custody determination). LeBrun is in his mid-fifties. He is a military veteran and is gainfully employed as a manager in a real estate office. He has a college education and has completed one year of law school. In short, LeBrun is an educated, sophisticated individual. More important, LeBrun had past experience and dealings with NCIS investigators. NCIS agents interviewed LeBrun on four different occasions. Significantly, in none of the prior interviews was LeBrun placed under arrest. Thus, on this occasion, after learning that the interviewers were NCIS agents, LeBrun could draw upon his experiences with other NCIS agents to conclude that he would not be arrested here. LeBrun would have no reason to disbelieve the agents when they explicitly informed him before entering the Highway Patrol Station that he was not under arrest and that he was free to leave at any time. LeBrun also would have no reason to disbelieve the agents when they told him on three separate occasions during the interview that he was free to leave and that he could go home. In fact, the district court found that at the start of the interview, LeBrun believed he could terminate the interview and leave. The fact that Agents Early and Grebas did not arrest LeBrun after the interview supports the conclusion that LeBrun was not in custody.

<u>Mathiason</u>, <u>Beheler</u>, and the above cited decisions of this court are indistinguishable from this case in all relevant respects. Thus, viewing the totality of

the circumstances, we conclude that a reasonable, college-educated, and legally-trained person who has had prior experience with the practice and procedure of a particular law enforcement organization, who willingly agreed to be interviewed, who was specifically told on four different occasions during the course of the interview that he was not under arrest and could go home, and who could easily facilitate transportation from the interview site via cellular phone would not have perceived that his freedom of action was restrained to the degree associated with formal arrest, and was therefore not "in custody."

## III.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir.), cert. denied, 534 U.S. 1124 (2001). Whether a confession is involuntary is judged by the totality of the circumstances. See Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001). The court must look at the "conduct of the officers and the characteristics of the accused." See id. The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary. See United States v. Astello, 241 F.3d 965, 966 (8th Cir.), cert. denied, 533 U.S. 962 (2001). We review the district court's findings of fact for clear error and its legal conclusion as to whether a confession was voluntary de novo. See id.

The facts surrounding the confession are straightforward. LeBrun confessed to strangling Ensign Muns after only thirty-three minutes of questioning. Neither Agent Grebas nor Agent Early was armed during the interview. The agents never shouted at LeBrun or physically threatened him. The government concedes that it used psychological pressure to facilitate a confession. The district court correctly recognized that the type of psychological pressure Agents Grebas and Early exerted

13

on LeBrun here did not alone render his confession involuntary.  See Astello, 241 F.3d at 967-68 (holding that tactics such as subjecting a suspect to psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him did not render a confession involuntary).  The district court concluded, however, that these tactics, when coupled with certain statements that Agents Early and Grebas made concerning nonprosecution, rendered LeBrun's confession involuntary.  The critical exchange occurred as follows:

> LEBRUN: So, am I hearing that I won't be prosecuted?
> GREBAS: That's what you are hearing.
> LEBRUN: Is that what I am hearing?
> GREBAS: That's what you are hearing.
> EARLY: If it's [the killing of Ensign Muns] spontaneous and that's the truth, you will not be prosecuted.
> GREBAS: That's absolutely right.
> LEBRUN: I am here to tell you there was no premeditation.
> EARLY: All right.
> LEBRUN: It was spontaneous.
> EARLY: Okay.
> GREBAS: So it was, let me get this clear.  It was spontaneous?
> LEBRUN: Correct.
> GREBAS: If this is true, then you killed him and it was over, it was over the money; is that right?
> LEBRUN: I don't know what it was over.

(R. at 65-66.)  The district court noted that the agents qualified their representations by stating to LeBrun that it was only "possible" that LeBrun would not be prosecuted.  The district court explicitly did not "make any findings as to what–if any–promise was actually made, or what the legal effect of any promise [was]."  (R. at 83-84.)  Instead, the district court found only that "LeBrun believed he would not be prosecuted if he confessed to a 'spontaneous' murder."  (R. at 83.)

14

Applying the facts as found by the district court to the controlling legal standard, we conclude that LeBrun's confession was not compelled because a defendant's mistaken belief that he could not be prosecuted does not render a confession involuntary. See United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (stating that defendant's mistaken belief that he had been promised leniency would not render confession involuntary); Winfrey v. Wyrick, 836 F.2d 406, 411-12 (8th Cir. 1987) (concluding that defendant's murder confession was voluntary even though defendant was encouraged to talk because of erroneous belief that if the shooting was accidental it would negate an element of the offense), cert. denied, 488 U.S. 833 (1988).

Even assuming that a reasonable person would view the Agents' statements as a promise, a promise made by law enforcement "does not render a confession involuntary per se." Simmons, 235 F.3d at 1133; see also Tippitt v. Lockhart, 859 F.2d 595, 598 (8th Cir. 1988) (concluding that defendant's confession was voluntary despite officers' promise), cert. denied, 490 U.S. 1100 (1989). A promise is merely one factor in the totality of the circumstances. See Simmons, 235 F.3d at 1133 (stating that a promise made by law enforcement is only one relevant consideration). Whatever the facts of an individual case, our polestar always must be to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination. Thus, it is not enough to show that the authorities' representations were the but-for cause of a confession. See Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973) (concluding that a but-for type analysis is inadequate because "[u]nder such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind"). Therefore, even assuming that the agents' statements could be construed as a promise and that the statements induced LeBrun's confession, our inquiry remains the same: whether the facts surrounding this interview demonstrate that the authorities overbore LeBrun's will and capacity for self-determination. This

15

is a very demanding standard, and we are of the view that the facts of this case do not rise to that level.

We have previously concluded that a promise not to seek execution or a promise not to prosecute failed to render the confessions of similarly situated defendants involuntary. For example, in Tippitt, we held that the government's promise to a defendant not to prosecute him for capital murder in exchange for a confession did not render the confession involuntary in light of other facts showing that the interrogation was brief and that the defendant possessed an eleventh grade education. See 859 F.2d at 598. We do not think it unreasonable to assume that the psychological pressure exerted on the defendant in Tippitt to render a confession and thereby avoid execution would be at least as great as the psychological forces presented in this case. In United States v. Larry, 126 F.3d 1077 (8th Cir. 1997), we held that the defendant's statement implicating himself as being a felon in possession of ammunition was voluntary even though it was induced by a promise that the defendant would not be prosecuted for a separate offense involving a drive-by shooting. See 126 F.3d at 1079. The facts of this case are no more compelling than those in Tippit or Larry.

We place substantial weight on the fact that LeBrun confessed after a mere thirty-three minutes. Thus, this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time. We also place significant weight on the fact that LeBrun testified that he had a subjective understanding of his Miranda rights at the time of the interview. See Simmons, 235 F.3d at 1133-34 (stating that a particularly compelling fact militating in favor of finding a voluntary confession was that defendant understood his rights). We also place substantial weight on the fact that LeBrun was a sophisticated individual with legal training. LeBrun was fifty years old at the time of the interview. He has served in the military, attended five years of college and one year of law school, and worked as a manager in a real estate office. As we have noted, "one of the key concerns in

16

judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." Wilson, 260 F.3d at 952. Generally, we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled. See, e.g., United States v. Gallardo-Marquez, 253 F.3d 1121, 1123-24 (8th Cir.) (concluding confession was voluntary where defendant was of average intelligence and had prior contact with law enforcement), cert. denied, 534 U.S. 1031 (2001); Astello, 241 F.3d at 968 (concluding that confession of an eighteen-year-old was voluntary where he had completed eleventh grade and possessed a capacity to understand what was being said during the interview); Simmons, 235 F.3d at 1134 (concluding that confession was voluntary where defendant had full scale I.Q. of 88); cf. Wilson, 260 F.3d at 949 n.4 & 952-53 (finding involuntary confession where defendant was mentally retarded, his overall mental abilities were in the bottom two percent of the population, and testimony revealed that he could be "talked into anything").

In addition to possessing average intelligence, LeBrun did not display any unique sensitivity that would indicate that the agents might overbear his will. LeBrun had met with NCIS investigators on four prior occasions. The videotape of the interview demonstrates that LeBrun was composed and aware of his surroundings and the circumstances confronting him. In fact, as LeBrun and the Agents discussed the potential statute of limitations problems, LeBrun became more animated and much more interested in the interview. After watching the videotape, it is apparent that LeBrun is an intelligent, calculating person who erroneously perceived a potential loophole in the prosecution's case and tried to take advantage of it by confessing to "spontaneous" murder. Whatever his motivation, it is clear to us that LeBrun's capacity for self-determination was not impaired. Thus, the district court erred in concluding that LeBrun's confession was involuntary.

17

## IV.

For the reasons stated above, we reverse the judgment of the district court and remand the case for further proceedings.

MORRIS SHEPPARD ARNOLD, Circuit Judge, with whom McMILLIAN, BYE, and SMITH, Circuit Judges, join, dissenting.

I pass over the question of whether Mr. LeBrun was in custody when he confessed to the murder of Mr. Muns, and go directly to the matter of whether his confession was voluntary, since I think that the case can be resolved rather quickly and easily on that ground. Because it appears to me that Mr. LeBrun's confession was the product of an overborne will, I would affirm the district court. Our panel opinion in this case, *see United States v. LeBrun*, 306 F.3d 545, 548-50, 552-56 (8th Cir. 2002), *vacated and reh'g en banc granted* (Dec. 31, 2002), very effectively rehearsed the tactics used to bring Mr. LeBrun to the point of confessing, which included threatening to ruin him financially, preying on fears related to his cancer, and vividly limning the effects that protracted civil and criminal litigation in a faraway place would have on his family, on its reputation, and in particular on his pregnant wife. I will therefore content myself with some observations on the court's opinion and on some matters that I think have not already received proper attention in previous opinions.

While, as the court notes, the agents never shouted at Mr. LeBrun or threatened him physically, the district court found on ample evidence that the atmosphere at the interrogation was police-dominated and that the agents frequently raised their voices and changed their tone when doing so. They also interrupted Mr. LeBrun in a bullying manner and demonstrated a threatening kind of impatience with him. The court indicates that *United States v. Astello*, 241 F.3d 965 (8th Cir. 2001), *cert. denied*, 533 U.S. 962 (2001), supports a conclusion that the type of pressure that Mr. LeBrun experienced could not alone render his confession involuntary, but the

18

case is distinguishable, and it certainly establishes no bright-line legal rule about psychological pressure. In fact, the nature of the question at the heart of this case necessarily reduces the precedential value of previous cases considerably.

The court also adverts to the fact that the district court made no findings as to what promises the interrogators actually made, but instead found only that Mr. LeBrun reasonably believed that he was promised that he would not be prosecuted if he would say that he had killed Mr. Muns "spontaneously." The court then looks for support in cases that hold that a mistaken belief as to what the law is will not render a confession involuntary. But in at least one of those, *Winfrey v. Wyrick*, 836 F.2d 406, 411-12 (8th Cir. 1987), *cert. denied*, 488 U.S. 833 (1988), it was crucial to the holding that the defendant's mistaken belief that he would not be prosecuted was not induced by anything that his interviewers told him; it was based entirely on his own ideas about what the law was. I agree that that kind of mistake cannot possibly render a confession inadmissible. But the clear purport of what the agents said in this case was that Mr. LeBrun would not be prosecuted if he said what the agents wanted him to say, and they even assured Mr. LeBrun that Mr. Muns's family approved of the deal. Indeed, they said that the family would not pursue civil remedies if he confessed and apologized. What the family wanted, the interrogators said, was simply to clear Mr. Muns's name.

In addition to the part of the interview that the court quotes in its opinion, the record reveals that, both before and after the exchange that the court isolates, the interviewers made reference to an alleged statute of limitations difficulty that would prevent prosecution for a "spontaneous" murder; and the officers intimated, moreover, that if Mr. LeBrun would simply admit to a spontaneous killing, they would call the United States Attorney in charge of the prosecution and tell him that there was no case against Mr. LeBrun. In addition, I respectfully suggest that the district court did not, as the court maintains, note that the agents qualified their representations by telling Mr. LeBrun that it was "only 'possible' " that he would not

19

be prosecuted. In relevant part, the transcript of the interview reveals only that one of the agents said at one point that "it was possible, beyond possible" that no prosecution would take place if Mr. LeBrun would cooperate, which is significantly different from what the court asserts was said. Taken in their entirety, the agents' assurances, which operated both as representations of what the law was and as promises, were categorical.

The district court shrank from holding that an absolute promise not to prosecute was made, not because of this part of the exchange between Mr. LeBrun and his interrogators, but because the promise not to prosecute was fleetingly qualified at one point, by one agent, by the condition that Mr. LeBrun must be telling the truth that the killing was spontaneous before the government would refrain from prosecution. This transitory allusion to truth-telling does nothing to undermine the district court's factual finding that Mr. LeBrun believed that he would not be prosecuted. My own examination of the transcript and the video tape leaves little room for doubt that the agents were in fact making such a representation about the law and a promise that Mr. LeBrun would not be prosecuted, and indeed it appears that the entire interview was deliberately structured around this stratagem. But nothing in particular really turns on this point: The coercive effect, if any, of a reasonably perceived promise is exactly the same as that of an actual promise.

In addition to the coercive tactics that the court briefly rehearses, among the enlarged pictures displayed prominently on the wall of the small interrogation room was a picture of Mr. Muns's family at his gravesite. The agents, moreover, did not merely invent generic phantom witnesses to the killing; they contrived a bizarre tale of a suicide note implicating Mr. LeBrun, and even claimed that there were other witnesses to the killing who were so haunted that their lives had been ruined by what they had seen. These were all knowing falsehoods. None of this finds a place in the court's opinion. Finally, and perhaps most importantly, the court fails altogether to mention the district court's finding that, despite the agents' assurances, Mr. LeBrun

did not feel free to leave as the interview progressed. This is a finding of fact that is supported by Mr. LeBrun's testimony and cannot be reasonably rejected as clearly erroneous. It is also a finding that weighs heavily in favor of the district court's conclusion that Mr. LeBrun's confession was involuntary.

This is probably the right juncture to observe that it is not immediately apparent why statements by interrogators that are untrue, and known to be false, are more "coercive" than statements that are true. Such techniques may be reprehensible, but that fact would not seem to contribute to their propensity to overwhelm the will. Perhaps it is enough simply to note that the Supreme Court has said that "[t]he fact the police misrepresented the statements that [a witness] had made is ... relevant," *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), in circumstances like the present ones. But we need also to consider the possibility that what lies at the bottom of these kinds of cases is not merely an aversion to something called coercion, but a general uneasiness about the fairness of admitting confessions that were induced by knowing, lurid falsehoods and unfulfilled promises, whether "coercive" or not. In fact, the Supreme Court has specifically said that "the admissibility of a confession turns as much on whether the techniques for extracting the statements ... are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Miller v. Fenton*, 474 U.S. 104, 116 (1985).

In sum, a consideration of the evidence in this case, including the kinds of pressure that were brought to bear on Mr. LeBrun, the assurances of leniency that went unfulfilled, and the deceit that the interrogators practiced, leads me to the conclusion that his confession was illegally obtained and should have been suppressed. At the very least, it seems to me relatively plain that the government has not carried its burden, *see Lego v. Twoney*, 404 U.S. 477, 489 (1972), of showing that the relevant statements were voluntary.

I therefore respectfully dissent and would affirm the judgment of the district court. Affirming the judgment, not incidentally, has the effect of specifically performing the promise that an objective observer would conclude Mr. LeBrun's interrogators made to him, an altogether appropriate and equitable result.

_____