# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1723
_____

United States

*Plaintiff - Appellee*

v.

Danny Ferguson

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Rapid City
_____

Submitted: May 12, 2020
Filed: July 27, 2020
_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Following a jury trial, Danny Ferguson was convicted of one count of arson, in violation of 18 U.S.C. §§ 81 and 1153, related to a fire at a trailer home on the Pine

Ridge Reservation. The district court[1] sentenced Ferguson to time served, approximately 19 months, and three years of supervised release. On appeal, Ferguson challenges the district court's denial of a motion to suppress incriminating statements made during questioning after a polygraph examination and asserts that insufficient evidence supports his conviction. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Ferguson's conviction arises from the attempted burning of a trailer home on the Pine Ridge Reservation in South Dakota. The trailer home belonged to Christy Pierce, who lived there with two of her children and one grandchild. Pierce was known to Ferguson, as she had a contentious relationship with Ferguson's family. On the evening of April 7, 2015, Pierce was inside her trailer home when she heard her dog barking and smelled the odor of something burning. After looking outside and seeing nothing amiss, Pierce ignored the barks and odor, believing that the odor came from a space heater. The next morning, April 8, 2015, after Pierce's son, Samuel Rios, arrived for a visit, Pierce noticed burn marks on the front corner of her trailer home. Pierce and Rios also discovered a bottle that smelled like gasoline or kerosene. Based on these discoveries, Pierce believed that there had been a fire outside of her trailer home and that someone had tried to "burn [them] out."

At approximately 5:00 p.m. that same day, Pierce observed Ferguson driving by the trailer home on a motorcycle. Pierce and Rios then observed Ferguson drive his motorcycle up to her trailer home. When they went outside to investigate, Rios observed Ferguson place a blanket into the insulation under the trailer home and light

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota, adopting the report and recommendations of the Honorable Daneta Wollmann, United States Magistrate Judge for the District of South Dakota.

the blanket on fire. Pierce observed the same scene, but did not see Ferguson light the blanket; she observed flames only after the blanket had ignited. Pierce did not see Ferguson's face, but she recognized his hair, motorcycle, and jacket, having observed him driving onto the trailer home's yard moments earlier. Rios yelled at Ferguson, who rode away on his motorcycle. Rios then went inside to warn his family to leave the trailer home, before returning outside, pulling the burning blanket away from the insulation, and smothering the fire.

Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives subsequently inspected Pierce's property and concluded that both incidents had been intentional, rather than accidental. The Federal Bureau of Investigation (FBI) initiated an arson investigation. After Pierce and Rios identified Ferguson as the responsible party, two FBI agents, Agent Michelle Gruzs and Agent Mark Lucas, interviewed Ferguson at his home. The agents informed Ferguson he was not under arrest and could ask the agents to leave at any time. During their discussion with Ferguson, the agents made clear that they suspected Ferguson was responsible for the fires at Pierce's trailer home. In denying that he was responsible, Ferguson stated that he would be willing to take a polygraph examination. At some point during the discussion, Ferguson told the agents that they had crossed a line in their questioning, and he asked them to leave. The agents complied with Ferguson's request and left immediately.

Following the interview, Agent Gruzs and Agent Jeff Goble set up a polygraph examination for Ferguson. On the morning of the examination, Ferguson and his wife arrived at the Justice Center in Pine Ridge, South Dakota, where the examination was to take place. There, they met with John Witt, who, although not a licensed attorney, was Ferguson's tribal advocate.[2] The Justice Center is a facility that houses the tribal

---

[2]At the suppression hearing, Witt testified that he was a tribal advocate for the Oglala Sioux, Pine Ridge Indian Reservation. Although he is not a licensed attorney, Witt testified that he has been licensed to practice before the Oglala Sioux Tribal Court

judicial system and offices of the Bureau of Indian Affairs. The facility is divided into a public area and a secured area, which is where the Bureau of Indian Affairs space is located. To access this secured area, a person must be admitted by a receptionist; however, to exit the secured area, a person must simply walk back through the doors. Ferguson's polygraph examination took place in the secured area. Ferguson, his wife, and Witt all waited in the public area while the agents prepared the examination room.

Before the examination, Ferguson or Witt requested that Witt remain with Ferguson for the polygraph examination. The agents denied the request as it was against policy, the room was not large enough, and Witt's presence would be distracting to Ferguson. Only Agent Goble was in the room with Ferguson during the polygraph examination. At the beginning of the examination, Agent Goble read Ferguson a polygraph authorization form, which advised him he had the right to refuse the examination, he could leave or terminate the examination at any point, he could refuse to answer any questions, he had the right to remain silent, he had the right to stop questioning at any time, anything he said could be used against him, he had the right to consult with and have the presence of an attorney, and an attorney would be provided to him if he could not afford one. Ferguson signed the form.

During questioning, Agent Goble asked Ferguson about his medical history. Ferguson stated that, in 2000, he had been in an accident and suffered a fractured skull but did not offer any information about the effects of his skull fracture, nor was he asked any follow-up questions. When questioned specifically about the fire, Ferguson denied knowledge of it, but acknowledged that he understood he was being accused of attempting to start it. After several minutes of questioning about the fire, Ferguson

_____

since 1999, primarily practicing criminal law. Witt further testified that to be a tribal advocate, he was required to have knowledge of the Tribal Code and pay an annual licensing fee.

again denied the allegations, told Agent Goble he was going to leave, and walked out of the room.

After leaving the room, Ferguson went to the parking lot. When Agent Gruzs found Ferguson speaking with Witt in the parking lot, she asked Ferguson why he had left the room, and Ferguson responded that he had needed to use the restroom. However, according to Witt, Ferguson came to him to tell him he no longer wanted to take the polygraph examination. After speaking with Agent Gruzs and Witt for a few more minutes, Ferguson agreed to resume the polygraph examination. Upon resumption of the examination, Ferguson told Agent Goble that he had gotten nervous before leaving the room. Agent Goble again reminded Ferguson that he could leave and did not have to answer questions. Ferguson chose to resume the polygraph examination. Before the conclusion of the examination, Ferguson took one additional break of approximately five minutes after asking to use the restroom. Agent Goble then concluded the examination and asked Ferguson to give him a few minutes to score the results. Ferguson returned to the public area where Witt was waiting. After less than 10 minutes, Agent Gruzs brought Ferguson back to the examination room for a post-polygraph interview. Witt was not aware that the agents were going to question Ferguson independent of the polygraph examination, believing that all questioning would be conducted as part of the polygraph examination. The agents did not bring him to the examination room with Ferguson for this interview.

Agent Goble told Ferguson that he failed the polygraph examination, meaning that his answers had been "deceptive." Upon being questioned about his "deceptive" answers, Ferguson made incriminating statements, including that the trailer home should not have been in the pasture where it was located; that he did not know anyone would be home; that he did not mean to hurt anyone; that he would never do that again; and answered questions about how he started the fire. Ferguson also stated several times that he wanted to "plead the Fifth." After Ferguson made statements about not wanting to talk anymore or not wanting to talk about a specific topic, agents reminded

him that it was his right not to answer questions and that he could end the interview. When Ferguson finally asked whether the interview was being recorded and again stated that he "just want[ed] to plead the Fifth," the agents thanked Ferguson for coming to talk to them and ended the interview.

Ferguson was subsequently indicted on one count of arson for the April 7 and April 8 fires. Before trial, Ferguson filed a motion to suppress the statements he made to agents following the polygraph examination, arguing that he was in custody when he was interrogated and he was not given Miranda[3] warnings; that he was entitled to the presence of counsel, but was denied that right; that the interrogation was coercive; and that his statements were not voluntarily made. The district court, adopting the magistrate judge's report and recommendation, denied the motion. The district court concluded that Ferguson was not in custody, so he did not have a Fifth Amendment right to counsel or to remain silent and thus agents did not violate those rights. The district court also considered the facts and circumstances surrounding the questioning and concluded that Ferguson voluntarily made the incriminating statements.

The case proceeded to trial. At the close of the evidence, Ferguson moved for judgment of acquittal, which the district court granted with respect to the April 7 fire, but denied with respect to the April 8 fire. The jury returned a guilty verdict. Ferguson then filed two separate motions for judgment of acquittal or for a new trial, arguing that the evidence was insufficient to sustain his conviction. The district court denied both motions, and this appeal follows.

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

## II.

Ferguson asserts that the district court erred in denying his motion to suppress on multiple grounds: (1) Ferguson was denied his right to have his attorney present while he was being interrogated; (2) Ferguson's lay tribal advocate qualified as an attorney for the purposes of his right to have counsel present; (3) Ferguson invoked his right to remain silent, which was ignored by the agents; and (4) Ferguson's statements were not made voluntarily based on his limited cognitive functioning and the repetitive and deceptive questioning of agents. In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Giboney, 863 F.3d 1022, 1027 (8th Cir. 2017). "We will affirm the denial of a suppression motion unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the [c]ourt is left with a firm conviction that a mistake has been made." Id. (alteration in original) (internal quotation marks omitted).

Although Ferguson raises numerous points of error, the determination of a single issue disposes of nearly all of Ferguson's claims with respect to the suppression motion: whether he was in custody for the purposes of the Miranda protections. "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Thus, whether a person is in custody dictates whether he is entitled to Miranda protections. Id.

In making this determination, "the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." Id. (internal quotation marks omitted). To resolve this inquiry, we consider the circumstances surrounding

the questioning and whether, given those circumstances, a reasonable person would have felt free to terminate the questioning and leave. Id. Our Court has identified six factors to consider in making this determination:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Here, the record reflects that Ferguson came voluntarily to the Justice Center; that he was told his participation in the polygraph examination was voluntary and that he could end it at any time; and that he was read and signed the polygraph authorization form, which reiterated that he could refuse to take the test, decline to answer questions, end the test at any time, and have an attorney present. The record further demonstrates that Ferguson's movement was not restrained, as evidenced by the two breaks he took during the examination and his decision to return after each; his termination of the interview after he began making incriminating statements; and the agents ending the interview after Ferguson again reiterated his desire to "plead the Fifth."

These factors counsel in favor of the conclusion that Ferguson was not in custody during the polygraph examination or subsequent interview. Ferguson points to the refusal of the agents to permit Witt to be present during the interview and their purported misrepresentations about how many people could be in the examination

room and about whether a post-examination interrogation would occur as demonstrating the coercive and deceptive nature of the polygraph examination and subsequent questioning. However, "some degree of coercion is part and parcel of the interrogation process and [] the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." LeBrun, 363 F.3d at 721. Thus, even assuming the agents used arguably deceptive tactics and exerted some degree of coercion in questioning Ferguson, that does not undermine our conclusion that Ferguson was not in custody, particularly where the evidence reflects that Ferguson was aware of his freedom to leave and availed himself of this right at least twice during the entire encounter. Indeed, Ferguson's counsel conceded as much at oral argument, stating explicitly that "[Ferguson] was not in custody." Oral Arg. 5:50 - 6:00.

Because Ferguson was not in custody, he was not entitled to the Miranda protections of the right to remain silent and the right to counsel. United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003). Having determined that Ferguson was not in custody, and thus not subject to Miranda protections, we conclude that Ferguson's rights were not violated. We also need not determine whether Ferguson's lay tribal advocate qualified as an attorney for the purposes of the right to counsel where that right had not yet attached.

Finally, to the extent Ferguson asserts that his incriminating statements were involuntarily made, primarily due to his low cognitive functioning, we agree with the district court that Ferguson voluntarily provided the statements after the polygraph examination. "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (alteration in original) (citation and internal quotation marks omitted). The record

reflects, as discussed above, that a reasonable person in Ferguson's position would have understood that his participation in the interview was voluntary, that he did not have to answer any questions if he did not wish to do so, that he was free to leave at any point, and that he could terminate the questioning at any point. Ferguson's exercise of each of these options underscores the voluntary nature of his statements. On this record, we conclude that Ferguson's statements were voluntarily made.

The district court thus did not err in denying Ferguson's motion to suppress.

III.

Ferguson next challenges the district court's denial of the motions for judgment of acquittal based on the sufficiency of the evidence, which we review de novo. United States v. Hill, 750 F.3d 982, 987 (8th Cir. 2014). "We view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Id. (quoting United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010)).

Under 18 U.S.C. § 81, "[w]hoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously sets fire to or burns any building, structure or vessel, . . . or attempts or conspires to do such an act" is guilty of the offense of arson. The statute also imposes an enhanced maximum sentence where "the building [is] a dwelling or [] the life of any person [is] placed in jeopardy." Id. To convict Ferguson of this offense, the government was thus required to prove, beyond a reasonable doubt, that (1) Ferguson set fire or attempted to set fire to or burned a dwelling; (2) the dwelling belonged to the victim, Pierce; (3) Ferguson acted willfully and maliciously; (4) Ferguson caused Pierce or her family members' lives to be placed in jeopardy; and (5) Ferguson is an Indian and committed the offense in Indian country. R. Doc. 98, at 5. Ferguson asserts that the evidence was insufficient

-10-

to prove every element beyond a reasonable doubt, specifically challenging the weight of the evidence when the incriminating statements are excluded, arguing the witness identifications of Ferguson as the perpetrator were unreliable, asserting that testimony established Ferguson had an alibi for the relevant time frame, and alleging that no evidence demonstrated that the trailer home actually ignited.

First, as discussed in Part II, the district court did not err in denying the motion to suppress. Thus, Ferguson's incriminating statements were appropriately presented to the jury and are included in the evidence we consider in evaluating Ferguson's challenge to the sufficiency of the evidence. These incriminating statements, which include a description of how the fire was started and expressions of remorse, combined with the testimony of other witnesses placing Ferguson at the scene and identifying him as the perpetrator, provide a sufficient basis for a jury to find Ferguson guilty beyond a reasonable doubt.

Second, as to Ferguson's argument regarding the testimony of Pierce and Rios identifying Ferguson as the perpetrator and the testimony of other witnesses providing Ferguson an alibi, "it is well established that the issue of witness credibility is virtually unreviewable on appeal because it is preeminently the job of the finder of fact." United States v. Ziesman, 409 F.3d 941, 948 (8th Cir. 2005) (internal quotation marks omitted); see also United States v. Wilson, 619 F.3d 787, 795 (8th Cir. 2010) ("[E]ven [i]f the evidence adduced at trial rationally supports conflicting hypotheses, we [will] refuse to disturb the conviction. We will overturn a verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." (alterations in original) (citation and internal quotation marks omitted)). We will not disturb the jury's credibility determinations and its decision to credit certain witness testimony over other evidence. This is particularly true where, as here, the district court instructed the jury regarding Ferguson's alibi defense, how to evaluate Ferguson's statements and witness testimony, and how to determine what weight to afford specific evidence.

-11-

Finally, as to Ferguson's argument regarding the lack of evidence that the trailer home actually ignited, Ferguson fails to acknowledge that the statute specifically criminalizes attempted arson and  the superseding indictment specifically charged Ferguson with attempt.  <u>See</u> 18 U.S.C. § 81; R. Doc. 71.

Sufficient evidence supports the jury's verdict.  The district court thus did not err in denying Ferguson's motions for judgment of acquittal on this basis.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____