United States Court of Appeals

For the Eighth Circuit

_____

No. 21-2463
_____

United States of America,

*Plaintiff - Appellee*,

v.

Ramon Simpson,

*Defendant - Appellant*.
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 11, 2022
Filed: August 15, 2022
_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Ramon Simpson was convicted of kidnapping resulting in death and conspiracy to commit kidnapping. On appeal, Simpson challenges several rulings of the district court[*] and the sufficiency of the evidence in support of the convictions. We affirm.

_____

[*]The Honorable Brian C. Buescher, United States District Judge for the District of Nebraska.

I.

The brutal crime at issue occurred on November 4, 2018. On that date, Simpson and Joseph James traveled with a friend to a bar in Yankton, South Dakota. The men then decided to drive to a strip club in Lesterville, South Dakota. On the way to Lesterville, they stopped near a farm, where Simpson and James got out of the car.

The farm was owned by Phyllis Hunhoff's mother. Simpson and James encountered Phyllis Hunhoff as she was driving home from the farm. The prosecution's theory at trial was that the two men kidnapped Ms. Hunhoff and drove with her toward Simpson's house in Norfolk, Nebraska. The prosecution alleged that the perpetrators then physically and sexually assaulted, strangled, and disemboweled Ms. Hunhoff. James purchased gasoline, drove to a remote dirt access road, and attempted to burn Ms. Hunhoff's body and car. After an investigation, James pleaded guilty to first-degree murder and was sentenced to life imprisonment.

A grand jury charged Simpson with kidnapping resulting in death (as well as aiding and abetting that offense), 18 U.S.C. §§ 2, 1201(a)(1), and conspiracy to commit kidnapping, *id.* § 1201(c). Before trial, Simpson moved to suppress statements made during conversations with an FBI agent on November 8 and 21, 2018. The district court denied the motion after concluding that Simpson was not in custody during the conversations, did not invoke his right to remain silent in any event, and made the statements voluntarily. Simpson also moved to exclude photographs and a video of Ms. Hunhoff's body at the crime scene and during her autopsy on the ground that they were unfairly prejudicial. The court granted the motion in part, but allowed the prosecution to introduce some of the photographs and the video.

A jury convicted Simpson of both offenses. The district court imposed concurrent sentences of life imprisonment on each count.

## II.

## A.

Simpson's first argument on appeal is that the district court erred by denying his motion to suppress statements from the interviews on November 8 and 21, 2018. He contends that investigators subjected him to custodial interrogations without advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

According to the district court's findings, Agent Howard visited Simpson at his residence on November 8, four days after the kidnapping. Howard had attempted to contact Simpson earlier that day. Simpson returned the call and invited Howard to meet at the home. Simpson admitted Howard into the residence, and they spoke at the dining room table, with Simpson's wife seated on a couch nearby. Howard was dressed in plain clothes with no weapon visible. Simpson was not handcuffed or otherwise restrained during the interview. Howard never said that Simpson would be arrested, and when the twelve-minute interview concluded, Howard departed.

In determining whether a defendant was in custody, the critical inquiry is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (internal quotations omitted); *see California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). We consider "the circumstances surrounding the questioning and whether, given those circumstances, a reasonable person would have felt free to terminate the questioning and leave." *United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020).

We conclude that there was no custodial interrogation of Simpson on November 8. Simpson responded to the FBI agent's request for a conversation and agreed to let the agent come to his house for the meeting. The agent did not display a weapon or restrain Simpson in any way. The agent was dressed in plain clothes and allowed Simpson's wife to sit nearby for the interview. The questioning was conducted in Simpson's living room, on his "own turf." *See United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985). Under these circumstances, a reasonable person would have felt free to terminate the interview and have the agent depart if he did not wish to speak further. It was not necessary for the agent to state affirmatively that the questioning was voluntary and that Simpson was free to leave. *Miranda* warnings were not required.

Regarding November 21, 2018, the district court found that Simpson agreed to meet the FBI agent at a police station and drove there voluntarily. At the outset, the agent and Simpson spoke for about twenty-five minutes. Although this interview took place on law enforcement's "home turf," the plain-clothed agent informed Simpson that he was not under arrest and that he was free to leave at any time. The provision of this guidance is a strong objective indicium that a reasonable person would feel free to leave. *Williams*, 760 F.3d at 814-15.

Simpson was not restrained, the agent did not block the exit, and Simpson was offered a bathroom break during the short meeting. The agent did not raise his voice, threaten Simpson, or display a weapon. Simpson complains that the room was small and the door was closed, but these factors are not sufficient to place Simpson in custody. The agent told Simpson that he was free to leave, so he could have risen, opened the door, and departed as he wished. The district court correctly determined that Simpson was not in custody when meeting with the agent, and no *Miranda* warnings were required.

After the initial questioning on November 21, a polygraph examiner advised Simpson of his *Miranda* rights and obtained his consent to conduct a polygraph examination. The polygraph examiner spoke with Simpson for approximately five hours, during which time he was offered breaks to smoke and use the restroom. At that point, however, Simpson had been warned under *Miranda*, so it is immaterial whether he was in custody, and we need not consider the point further.

After the polygraph examiner was finished, the FBI agent resumed questioning Simpson for about fifty minutes. During this period, Simpson answered questions but stated repeatedly that he wanted to go home. Simpson maintains that his repeated requests to go home constituted an invocation of his right to remain silent, and that the agent was required under the *Miranda* rule to cease questioning. *See Miranda*, 384 U.S. at 473-74. Even assuming for the sake of analysis that Simpson was in custody, however, a suspect's invocation of his right to remain silent must be clear and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010); *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016).

Simpson's repeated statements that he wished to go home were not unambiguous invocations of his right to remain silent. "[T]he prospect of going home would naturally be of great interest to any suspect undergoing interrogation," but like the Eleventh Circuit, we are not persuaded that a statement about wanting to go home "evidences a refusal to talk further." *Moore v. Duggar*, 856 F.2d 129, 134 & n.1 (11th Cir. 1988). That Simpson reiterated the wish many times does not transform his expression of a desire to be elsewhere into an unambiguous assertion of the right to remain silent. Simpson was informed in the *Miranda* warnings that he had a right to remain silent, but he never asserted that right, and he continued to answer questions for more than fifty minutes after first stating that he wanted to go home. The district court did not err in concluding that the questioning complied with the *Miranda* rule.

Simpson also claims that his statements on both dates were involuntary and should be suppressed based on the Due Process Clause. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001). Simpson has not made that showing here. There were no threats or promises that might have overborne Simpson's will. There is no indication that Simpson is particularly susceptible to undue influence: he is an adult of average intelligence who has earned an associate's degree and is familiar with the protections afforded by the legal system due to an extensive criminal history. *See Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004); *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (en banc). The court properly denied the motion to suppress.

B.

Simpson next argues that the district court erred at trial by admitting photographs and a video that depicted the crime scene, the interior of Ms. Hunhoff's vehicle, and Ms. Hunhoff's autopsy. He contends that images of Ms. Hunhoff's body are so gruesome and inflammatory as to be inadmissible. Under Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Ruiz*, 412 F.3d 871, 880-81 (8th Cir. 2005).

The photographs and video had probative value. They corroborated testimony by officers about the location and state of Ms. Hunhoff's body when it was discovered, and they tended to show the cause of death. By showing the extensive nature of Ms. Hunhoff's wounds and the absence of some clothing, the images made it more probable that she was not a willing passenger in the car. The autopsy photographs aided the medical examiner's testimony concerning the timing of Ms.

Hunhoff's injuries. The court limited the number of images that were introduced, but it was not required to exclude this evidence entirely. The evidence was probative and did not serve merely to inflame the passions of the jurors. *See United States v. Ingle*, 157 F.3d 1147, 1153 (8th Cir. 1998). The district court did not abuse its discretion by concluding that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice.

## C.

Simpson next contends that the district court erred in instructing the jury on liability for aiding and abetting a kidnapping resulting in death. The court instructed that a defendant who aided and abetted that offense must have had enough advance knowledge of the kidnapping that he was able to walk away before the kidnapping was completed. Simpson argues, however, that the court also should have instructed that an aider and abetter must have advance knowledge that a death would result from the kidnapping. The district court rejected that position, concluding that because the government is not required to prove that the principal actor intended to kill or knew that death would result, the government also need not prove that an aider and abetter had advance knowledge that death would result.

Simpson contends that his proposed instruction is required by *Rosemond v. United States*, 572 U.S. 65 (2014). There, the Court considered a defendant charged with aiding and abetting the offense of using or carrying a firearm during and in relation to a drug trafficking offense under 18 U.S.C. § 924(c). The Court held that an aider and abetter in that situation must have advance knowledge that one of his confederates is carrying a gun. *Id.* at 77-78. Simpson points to statements in *Rosemond* that an aider and abetter must have "a state of mind extending to the entire crime," and that his "intent must go to the specific and entire crime charged." *Id.* at 76.

*Rosemond* addressed aiding and abetting liability for a "double-barreled crime" that requires proof of both "the use or carriage of a gun" and "the commission of a predicate (violent or drug trafficking) offense." *Id.* at 71. The Court concluded that an aider and abetter of the § 924(c) offense need only facilitate one of these acts—*e.g.*, a drug transaction—but must intend to aid in the commission of both—*e.g.*, a drug transaction *and* use of a gun. *Id.* at 74-76. So while an aider and abetter's affirmative act may relate to only part of the § 924(c) crime, his state of mind must extend to the entire offense. *Id.* at 76.

*Rosemond* does not require, however, that a defendant charged with aiding and abetting a kidnapping resulting in death must have advance knowledge of the death. Under § 924(c), a principal offender must knowingly commit both requisite acts, and it followed in *Rosemond* that the aider and abetter must have advance knowledge of both acts. But under § 1201(a), the government must prove the principal's knowledge and intent only with respect to the kidnapping. The government also must prove that the kidnapping *caused* the victim's death, but not that the principal intended or knew that death would result. *United States v. Barraza*, 576 F.3d 798, 807 (8th Cir. 2009). Therefore, the district court properly concluded that the government was required to show that Simpson had advance knowledge of the kidnapping, but not that death would result, to establish an aiding and abetting offense. *See United States v. Bell*, 573 F.2d 1040, 1046 (8th Cir. 1978) ("It would be anomalous to hold that specific intent was a necessary element of aiding and abetting a crime, but not of the crime itself.").

Simpson counters that the First Circuit recently applied *Rosemond* to require advance knowledge of an element for aiding and abetting liability despite the absence of a *mens rea* requirement for the principal. In *United States v. Encarnación-Ruiz*, 787 F.3d 581 (1st Cir. 2015), a divided panel held that a conviction for aiding and abetting the production of child pornography required proof that an aider and abetter had advance knowledge that the victim was a minor, even though there was no

corresponding *mens rea* requirement for the principal. *Id.* at 588-89. But in reaching that conclusion, the court emphasized that the age of the victim was the only fact that made the principal's conduct a crime. The court deemed it improper to allow a conviction for aiding and abetting where a defendant had only a fleeting connection to the crime and no knowledge that criminal activity was afoot. *Id.* at 590. Even accepting that conclusion for the sake of analysis here, the reasoning does not extend to aiding and abetting a violation of § 1201(a). The jury was required to find that Simpson had advance knowledge that he was aiding and abetting a kidnapping, so there is no danger that he was convicted of committing an offense without fault.

We conclude that there was no error in declining to instruct the jury that the government must prove that Simpson knew in advance that death would result from the kidnapping of Ms. Hunhoff. The jury instruction fairly and adequately submitted the aiding and abetting charge to the jury, and there was no abuse of discretion.

D.

Finally, Simpson challenges the sufficiency of the evidence to support his convictions. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the jury's verdict. We will affirm unless no reasonable jury could have returned a guilty verdict. *United States v. Chastain*, 979 F.3d 586, 591 (8th Cir. 2020).

Simpson was convicted of kidnapping resulting in death and conspiracy to commit kidnapping. He maintains, however, that James acted alone, and that he merely rode home in Ms. Hunhoff's car before James initiated the kidnapping. Simpson made this claim in a recorded interview with investigators that was played to the jury, and he contends that his version established reasonable doubt. We conclude, however, that the jury reasonably could have discounted Simpson's version as a false exculpatory narrative.

The government's evidence was sufficient to support a finding of guilt beyond a reasonable doubt. Simpson gave shifting stories to investigators about the events of November 4, 2018. He eventually admitted that he was in Ms. Hunhoff's car with her and James, although he claimed that Ms. Hunhoff dropped him off at home without incident. According to Simpson's jail bunkmate, Simpson later admitted that he and James kidnapped, raped, and murdered a woman whom they "choked and stabbed." Consistent with these admissions, Ms. Hunhoff's autopsy showed bruising to her torso, limbs, and genitals, and found that her death was caused by strangulation and a stab wound. That Ms. Hunhoff did not answer several telephone calls from her mother while traveling between Yankton and Norfolk tended further to show that a kidnapping was in progress throughout the drive, and that Simpson was not an innocent passenger taking a ride home.

Based on this evidence, a reasonable jury could have concluded that Ms. Hunhoff was seized and held against her will, that Simpson knowingly and actively participated in the kidnapping, that Simpson conspired to participate in a kidnapping, and that the kidnapping resulted in Ms. Hunhoff's death. There was sufficient evidence to support the convictions.

*     *     *

The judgment of the district court is affirmed.

_____